UNITED STATES, Appellee

V.

Toro KHAMSOUK, Ship's Serviceman Seaman Apprentice
U.S. Navy, Appellant

No. 01-0387

Crim. App. No. 9900711

United States Court of Appeals for the Armed Forces

Argued November 27, 2001

Decided September 20, 2002

BAKER, J., delivered the judgment of the Court. CRAWFORD,
C.J., GIERKE and EFFRON, J.J., and SULLIVAN, S.J., each
filed an opinion concurring in and dissenting in part.


<u>Counsel</u>

For Appellant: <u>Lieutenant Hardy Vieux</u>, JAGC, USNR (argued).

For Appellee: <u>Major Robert M. Fuhrer</u>, USMC (argued);
<u>Colonel Rose M. Favors</u>, USMC (on brief); <u>Colonel M. W.
Fisher</u>, USMC, <u>Major Edward C. Durant</u>, USMC.


Military Judge: Mark S. Utecht


<u>**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**</u>.

Judge BAKER delivered the judgment of the Court:

Appellant was tried by a military judge sitting as a general court-martial. Contrary to his pleas, he was convicted of fraudulent enlistment, five specifications of larceny, forgery, and sixteen specifications of the unauthorized use of another's credit card in violation of Articles 83, 121, 123, and 134, Uniform Code of Military Justice (UCMJ), 10 USC §§ 883, 921, 923, and 934, respectively. The adjudged and approved sentence provided for a bad-conduct discharge, confinement for five years, a fine of $2,500, forfeiture of all pay and allowances, and reduction to pay grade E-1. The Court of Criminal Appeals affirmed the findings and sentence. 54 MJ 742 (2001). We granted review of the following issues:

I

> WHETHER THE MILITARY JUDGE ERRONEOUSLY DENIED
> APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED
> FROM AN UNLAWFUL ENTRY IN A THIRD PARTY'S HOME BY
> MILITARY LAW ENFORCEMENT AGENTS WHO, BELIEVING HE
> WAS INSIDE, ENTERED THE RESIDENCE WITHOUT A SEARCH
> WARRANT IN VIOLATION OF THE FOURTH AMENDMENT.

II

> WHETHER THE APPREHENSION OF APPELLANT BY MILITARY
> LAW ENFORCEMENT AGENTS, AFTER THEIR ENTRY INTO A
> PRIVATE THIRD PARTY RESIDENCE, WAS IN VIOLATION OF
> RCM 302(e)(2) AND HIS CONSTITUTIONAL PROCEDURAL
> DUE PROCESS RIGHTS.

III

> WHETHER THE LOWER COURT ERRONEOUSLY CONCLUDED THAT
> THE INORDINATE AND UNEXPLAINED POST-TRIAL DELAY

CAUSED BY THE MILITARY JUDGE DID NOT PREJUDICE
APPELLANT.

We conclude that the entry into a civilian third party's residence violated the Fourth Amendment, U.S. Const. amend. IV.[1]  Nonetheless, for the reasons set forth below, we hold that the evidence obtained subsequent to this illegality was not subject to suppression at trial. However, regarding Issue III, we find it necessary to order a remand to the Court of Criminal Appeals for that court's analysis of appellant's claim in light of this Court's decision in United States v. Tardif, __ MJ ___ (2002).

## Background

On December 18, 1996, the Naval Criminal Investigative Service (NCIS) initiated an investigation into several checks fraudulently passed through the Atlantic Fleet Credit Union.  Appellant soon became the focus of this investigation.  When Special Agent (SA) Edward M. Coyle, the lead investigator on the case, contacted appellant's command, he learned that appellant had been an unauthorized absentee since December 12, 1996.  On January 6, 1997, appellant's commanding officer issued a Department of Defense (DD) Form 553 (Deserter/Absentee Wanted by the Armed Forces).  On February 5, 1997, an informant advised SA Coyle

---

[1] Our resolution of Granted Issue I obviates any need to reach Granted Issue II.

that appellant was staying at the private off-base residence of Hospital Corpsman Second Class (HM2) Tom Guest. The informant also indicated that appellant might be leaving the residence around 2:00 p.m. for an appointment. Other individuals contacted during the investigation informed SA Coyle that appellant often carried around a black knapsack thought to contain stolen or fraudulent credit cards and credit card receipts. Further, two young women interviewed by NCIS indicated that they had seen appellant in possession of credit card receipts that were not in his name. Based on this information, SA Coyle and three other NCIS agents went to HM2 Guest's residence to set up surveillance and await appellant's departure for his appointment. Although SA Coyle had a copy of the DD Form 553 in his possession, he did not have either a search warrant or an arrest warrant issued by a civilian magistrate. Because SA Coyle was not sure whether the knapsack was in the residence and because he knew the residence belonged to HM2 Guest, he believed that he needed a search warrant to search the residence. Since he did not have a search warrant, he made the decision to wait and attempt to apprehend appellant outside the residence.

At approximately 1:15 p.m., the NCIS agents saw two men leave the home, one of whom they thought fit appellant's description. They stopped the two men and discovered they

4

were in fact HM2 Guest and a friend, Bobby Salazar. SA Coyle then informed HM2 Guest that he had a warrant for appellant's arrest. HM2 Guest replied that appellant was still inside the residence. When asked whether NCIS agents could enter his residence to apprehend appellant, HM2 Guest replied, "I would prefer if [you] would wait and allow me to bring him out." SA Coyle followed HM2 Guest, stopping at the entrance to the front door while HM2 Guest entered.

The front door of the house opened into a foyer with an entrance on the left that led to a living room where appellant had been staying for two or three days, sleeping on a sofa. According to HM2 Guest, who was standing in the foyer, appellant was in the living room on the sofa when he entered the residence. However, neither the living room nor the sofa were visible from the front door. HM2 Guest called to appellant from the foyer and told him that there were people at the door to see him.

SA Coyle and HM2 Guest testified slightly differently about what transpired next. According to SA Coyle, when appellant stepped out of the living room to see who was at the door, he first asked appellant for his name. When appellant responded, SA Coyle informed him that he was under apprehension and entered the residence to take him into custody. As noted earlier, SA Coyle realized he needed a search warrant before entering HM2 Guest's residence to

search for appellant, which is why he and the other NCIS agents initially waited outside. However, when appellant appeared after being beckoned by HM2 Guest, SA Coyle reasoned that because appellant was "in my sight, in plain view," he was authorized to enter the residence. He also indicated that his concern for "officer safety" prompted his entrance because he did not know if there were other people or weapons in the room from where appellant had just emerged. In SA Coyle's view, the DD Form 553 authorized his entry to apprehend appellant. SA Coyle testified that appellant was approximately three feet inside the house when he told appellant he was under apprehension.

According to HM2 Guest, he entered his residence, stopped at the entrance to the living room, and called appellant. He stated that SA Coyle came past him as soon as appellant tried to look to see who was at the door. According to HM2 Guest, at this point SA Coyle entered the house, went to the entrance to the living room and told appellant, "'[D]on't move. I've got you,' or something to that effect." The military judge resolved this factual issue by finding that "[SA] Coyle, upon seeing [appellant] peek around the corner into the foyer, went inside the residence and placed [appellant] under military apprehension in the foyer."

Appellant was immediately given his Article 31, UCMJ, 10 USC § 831, rights upon apprehension and was guided back into the living room to the sofa. However, he was not questioned beyond being asked his name and, whether a knapsack adjacent to the couch belonged to him.[2] SA Coyle then asked appellant to sign a one-page consent form authorizing the search of his knapsack. According to SA Coyle, he apprehended appellant at 1:25 p.m. and appellant signed the form at some time between 1:25 p.m. and 1:45 p.m. The permissive search authorization form indicated appellant's consent to the search of his "personal bags, knapsack(s) and other luggage." It further stated that he was advised of, and understood, his "constitutional right to refuse to permit this search in the absence of a search warrant." Only after appellant's consent was given did SA Coyle seize the knapsack.

HM2 Guest subsequently consented to a search of his home for appellant's additional belongings. During this search, appellant's duffel bag was seized from a second floor room. The NCIS agents checked the bags for weapons and loaded them in their car for transport back to the NCIS field office in Norfolk, Virginia.[3]

---

[2] The military judge found that the knapsack was not "within the 'wingspan' of [appellant] at the time of his apprehension."

[3] The military judge specifically found that this was not a search of the bags.

The NCIS agents then took appellant and his bags to the field office. There, appellant acknowledged his Article 31 rights again and executed a written waiver of those rights. However, the agents did not seek additional consent to search his bags, at the field office. Special Agents Coyle and James Campbell then searched appellant's bags and questioned him about individual items as they discovered them. These items included credit card receipts and credit card numbers. The NCIS agents asked appellant if he had used the credit card numbers or signed the receipts. Appellant confessed that he had obtained the credit card numbers from a Mr. Ratsamy Phanivong, that he knew that they did not belong to Mr. Phanivong, that he did not have permission to use the credit card numbers, and that he used them fraudulently.

At trial, defense counsel made a timely objection to the admission of the contents of the bags and to the confession. The thrust of his argument was that the entry into HM2 Guest's residence violated R.C.M. 302, Manual for Courts-Martial, United States (2000 ed.),[4] and the Fourth Amendment. Therefore, he asserted, the evidence from the bags and the confession, derived from the illegal entry, were inadmissible. The military judge found the DD Form 553

---

[4] All Manual provisions cited are identical to those in effect at the time of appellant's court-martial.

to be the "functional equivalent of an arrest warrant," that appellant was not a "resident" of HM2 Guest's residence, and that appellant's consent was valid.

In this Court, appellant contends that he had a reasonable expectation of privacy in HM2 Guest's residence because he was an overnight guest and, therefore, has standing to challenge the search. He claims that the warrantless entry by the NCIS agents into HM2 Guest's residence violated the Fourth Amendment, and therefore, that the evidence and confession must be suppressed as fruits of the illegal entry.

The Government first argues that SA Coyle's apprehension of appellant satisfies the Fourth Amendment because a DD Form 553 is the equivalent of a civilian arrest warrant. In the alternative, the Government argues both that HM2 Guest consented to SA Coyle's entry into the residence, and that exigent circumstances independently justified the entry.[5]

For the reasons set forth in Part I of the discussion below, we reject the military judge's conclusion, and that of the court below, that the entry was lawful. However, in Part II, under the rationale of Brown v. Illinois, 422 U.S. 590 (1975), and Wong Sun v. United States, 371 U.S. 471

---

[5] We find it necessary to address only the first of these contentions. Furthermore, it is questionable whether the record supports the Government's latter two arguments.

(1963), we further conclude that appellant's subsequent consent to the search of his bags was not the exploited product of the prior illegal entry and thus, was sufficiently attenuated from that illegality.  Therefore, under the principles enunciated in New York v. Harris, 495 U.S. 14 (1990), the confession obtained at the field office was also sufficiently attenuated from the prior illegality and properly admitted at trial.

I

A military judge's denial of a motion to suppress is reviewed for an abuse of discretion.  United States v. Monroe, 52 MJ 326, 330 (2000).  A military judge's fact-finding is reviewed under a clearly erroneous standard, and his conclusions of law are reviewed de novo.  Id.

Granted Issue I requires us to consider the entry by military law enforcement officials into a civilian residence, without a civilian warrant, to apprehend a military member whom military officials have designated an unauthorized absentee or deserter.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV.

The history of the protections secured by this amendment is both long and familiar.  At its core stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511 (1961)(citations omitted).  The principles of the Fourth Amendment "apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life."  Boyd v. United States, 116 U.S. 616, 630 (1886).  Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ."  United States v. United States District Court For the Eastern District of Michigan, 407 U.S. 297, 313 (1972).  "The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance."  Johnson v. United States, 333 U.S. 10, 14 (1948).  "Were federal officers free to search without a warrant merely upon probable cause to believe that certain articles were within a home, the provisions to the Fourth Amendment would become empty phrases, and the protection it affords largely nullified."  Jones v. United States, 357 U.S. 493, 498 (1958).  See Kirk v. Louisiana, 536 U.S. __, __, 122 S.Ct. 2458, 2459 (2002)(per curiam)("[B]ecause 'the Fourth

Amendment has drawn a firm line at the entrance to the house . . .[, a]bsent exigent circumstances, that threshold may not reasonably be crossed without a warrant'")(quoting Payton, 445 U.S. at 590).

Application of the Fourth Amendment to these facts requires a review of several Supreme Court cases dealing with seizures within the home and the warrant requirement: Wong Sun, Brown, Payton, and Minnesota v. Olson, 495 U.S. 91 (1990).

A.

Standing

The first question is whether appellant has standing to challenge his arrest in the residence of HM2 Guest, a third party. The Government conceded at oral argument that appellant has standing as a resident of HM2 Guest's house to press his Fourth Amendment claim that the entry into the residence was unlawful. Notwithstanding this concession, we conclude independently that appellant has such standing.

Mil.R.Evid. 311, Manual, supra, states:

(a) General rule. Evidence obtained as a result of an unlawful search or seizure made by a person acting in a governmental capacity is inadmissible against the accused if: . . .

(2) [T]he accused had a reasonable expectation of privacy in the person, place or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under

12

the Constitution of the United States as applied
to members of the armed forces.

An arrest[6] is a seizure of the body covered by the
Fourth Amendment, and warrantless seizures inside a home are
presumptively unreasonable, absent exigent circumstances.
Payton, 445 U.S. at 585-86.  However, the arrest of a person
inside his own home made with a valid arrest warrant does
not violate the Fourth Amendment, and does not require a
search warrant.  Id. at 602-03.  In Payton, the Supreme
Court explained that an arrest warrant is sufficient to
protect a citizen's privacy interest in his own home when he
is arrested there.

> It is true that an arrest warrant requirement may
> afford less protection than a search warrant
> requirement, but it will suffice to interpose the
> magistrate's determination of probable cause between
> the zealous officer and the citizen . . . . Thus, for
> Fourth Amendment purposes, an arrest warrant founded
> on probable cause implicitly carries with it the
> limited authority to enter a dwelling in which the
> suspect lives when there is reason to believe the
> suspect is within.

Id.

Noting the distinct interests at issue between an arrest
warrant and a search warrant, the Court stated:

---

[6] As a matter of terminology, under R.C.M. 302(a)(1), Manual for
Courts-Martial, United States (2000 ed.), "the taking of a person
into custody" is referred to as "apprehension" and not arrest.
"Apprehension is the equivalent of 'arrest' in civilian terminology.
(In military terminology, 'arrest' is a form of restraint.  See
Article 9; R.C.M. 304.)"  R.C.M. 302(a)(1), Discussion, Manual,
supra.  However, apprehensions by military personnel are unlawful if
they violate the Fourth Amendment as applied to the armed forces.
See id.; Mil.R.Evid. 311(c)(1), Manual, supra.

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure.  A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

Steagald v. United States, 451 U.S. 204, 213 (1981).

In Olson, the Supreme Court extended the Fourth Amendment's protections to overnight guests.  The Court concluded that "Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."  Olson, 495 U.S. at 96-97.  Defendant Olson was implicated in a robbery and feared being arrested if he returned home.  State v. Olson, 436 N.W.2d 92, 96 (Minn. 1989).  Instead, that night he stayed at an acquaintance's home.  Id.  The following day, police were informed of Olson's whereabouts and proceeded to that location.  Olson, 495 U.S. at 93.  With guns drawn, they entered into the acquaintance's home without either permission or a warrant.  Id. at 94.  The Court held that Olson's subsequent arrest was unlawful.  Id. at 100-01.

Similarly, appellant had been staying with HM2 Guest for two or three days, sleeping on a sofa.  Like Olson, appellant was an overnight guest with a sufficient

14

interest in HM2 Guest's home and therefore, was protected from a warrantless arrest in the home under the Fourth Amendment as interpreted by Olson. Accordingly, appellant has standing to challenge the lack of an arrest warrant.[7] Id. at 98-99.

B.

Legality of the Apprehension.

As noted earlier, the Government contends that the DD Form 553, combined with the authority in Article 8, UCMJ, is the equivalent of a civilian arrest warrant. This form differs, however, from a civilian arrest warrant in several respects. First, it is issued by a military commander and gives authority to apprehend based on Article 8, UCMJ. The DD Form 553 in this case indicated on its face that the person named was a "Deserter/Absentee Wanted by the Armed Forces." On the fill-in-the-blank form, appellant's commanding officer[8] certified that appellant had been absent for 10 days, and that he had investigated appellant's absence. No authorization beyond the commander's signature was noted on the form. The reverse side of the DD Form 553 noted that the form itself, combined with an oral notification from military or federal officials "that the

_____

[7] While we deem it unnecessary to reach Granted Issue II, we assume, without deciding, that the use of the term "resident" in R.C.M. 302(e)(2)(D), Manual, supra, is coterminous with the term "householder" as used by the Supreme Court in Olson. See Olson, 495 U.S. at 95.

[8] Commander Daniel Holloway, USN, USS Gonzalez (DDG-66).

15

person has been declared a deserter and that his/her return to military control is desired," gives a civil officer authority to apprehend.  However, the DD Form 553 is applicable only to the military offense of desertion.

A federal arrest warrant, by contrast, is issued by a federal magistrate judge, derives its authority from the Federal Rules of Criminal Procedure and can be issued for any federal offense.  A federal arrest warrant may be issued after a finding of probable cause by a magistrate judge based upon a written complaint made under oath.  Fed. R. Crim. P. 3 & 4.  If the magistrate judge finds "probable cause to believe that an offense has been committed and that the person named in the complaint has committed it, a warrant for the arrest of that person shall issue to any officer authorized by law to execute it."  Fed. R. Crim. P. 4(a).  The warrant must be signed by the magistrate judge and contain the name or description of the person.  Fed. R. Crim. P. 4(c)(1).  Most significantly, however, a federal warrant may be executed "at any place within the jurisdiction of the United States."  Fed. R. Crim. P. 4(d)(2)(emphasis added).

We agree that, on a superficial level, a DD Form 553 resembles an arrest warrant issued by a federal magistrate judge.  However, in our view that is where the similarities end.  Because the source of authority of the two issuing

16

officials is different, so too is the legal effect of the two documents when the issue is entry into a civilian home.

The Supreme Court permits a non-lawyer to act as a magistrate judge as long as he is "neutral and detached," and "capable of determining whether probable cause exists for the requested arrest or search." Shadwick v. City of Tampa, 407 U.S. 345, 350 (1972). However, the Court also made clear that a magistrate judge must be a public civil officer with jurisdiction. Id. at 349 (emphasis added).[9] We conclude that the Constitution does not permit military investigators greater power to conduct warrantless entries into the civilian home than their civilian counterparts. See Posse Comitatus Act, 18 USC § 1385 (2000).[10] While a

---

[9] In limited instances, commanders can authorize searches for individuals on property not within military control, in foreign countries. Mil.R.Evid. 315, Manual, supra; see United States v. Chapple, 36 MJ 410 (CMA 1993)(applying the good faith exception to an invalid search authorization for an off-base apartment in foreign country not within military control).

[10] Congressional caution regarding military law enforcement in civilian settings is long-standing and is reflected in the Posse Comitatus Act (PCA), which provides, inter alia:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 USC § 1385 (2000).

Although the Navy and Marine Corps are not included in the plain language of the PCA, Congress directed the Secretary of Defense to promulgate regulations prohibiting all branches of the military from participating in civilian law enforcement activities as well. See 10 USC 375. In response, the Secretary of Defense promulgated Department of Defense (DOD) Directive 5525.5 (Jan. 15, 1986)(as amended Dec. 20, 1989), regulating the cooperation of military personnel with civilian

commander has powers similar to a federal magistrate judge, those powers are constrained in scope to persons and places under military control. See Mil.R.Evid. 315(c), Manual, supra.

In this case, SA Coyle correctly believed that he lacked the authority to initially enter and search a civilian residence possessing only a DD Form 553.  The DD Form 553, or its predecessor, has long been used to authorize civilian law enforcement to apprehend the named individual as a deserter under Article 8, UCMJ.  United States v. Holder, 10 USCMA 448, 451, 28 CMR 14, 17 (1959); United States v. Garner, 7 USCMA 578, 581, 23 CMR 42, 45 (1957).  In Garner, this Court noted that the genesis of Article 8, UCMJ, was the separation of civil and military jurisdiction that previously prevented civil authorities from apprehending deserters for a purely military crime. Garner, 7 USCMA at 581, 23 CMR at 45 (citing Kurtz v. Moffitt, 115 U.S. 487 (1885)).  However, none of these authorities stands for the proposition that either military or civilian officials acting pursuant to a request to

---

law enforcement officials.  The Secretary of the Navy issued SECNAV Instruction 5820.7B (Mar. 28, 1988), implementing the DoD Directive.

Although the PCA was passed in the context of Civil War reconstruction, Congress has had occasion to reconsider its reach in creating a patchwork framework of express exceptions to it, such as those covering certain training for civilian law enforcement personnel, and the use of military personnel to combat weapons of mass destruction when human life is at risk, and when civilian law enforcement is incapable of addressing the threat.  50 USC §§ 2301-02 (2000).

apprehend a military absentee, may do so by entering a
civilian residence without a civilian warrant.  Moreover,
this Court has also held that "a military commander — no
matter how neutral and impartial he strives to be — cannot
pass muster constitutionally as a 'magistrate' in the strict
sense."  United States v. Stuckey, 10 MJ 347, 361 (CMA
1981).  Among other things, a military commander is not a
civilian.  In short, the Fourth Amendment mandates that,
absent exigent circumstances, law enforcement officials of
all types possess a proper warrant or obtain consent prior
to entry in off-base civilian homes.

Therefore, we hold that the DD Form 553 is not the
functional equivalent of a civilian arrest warrant in the
context of entering a civilian home.[11]  Thus, SA Coyle's
entry into HM2 Guest's residence was a warrantless entry in
contravention of the Fourth Amendment.[12]

---

[11] We leave undisturbed present law allowing civilian and military
officials to apprehend in a public place military members sought
pursuant to a DD Form 553.

[12] The military judge at trial, and the Government in this Court, relied
on United States v. James, 464 F.2d 1228 (9th Cir. 1972), and Martin v.
Commonwealth, 592 S.W.2d 134 (Ky. 1979), for the proposition that
warrantless entry into the home may be effected by a civil officer with
probable cause to believe that a person is a deserter.  Since these
cases were decided prior to the Supreme Court's pronouncement in Payton,
they do not reflect applicable Fourth Amendment jurisprudence.  Whatever
value these authorities may have as precedent in their respective
jurisdictions, we find them unpersuasive and not binding on military
courts.

II

Having determined that the entry into HM2 Guest's residence to apprehend appellant was illegal, we turn now to the pivotal issue in this case, namely, appellant's consent to the search of his knapsack while still in the residence. Did the illegal entry vitiate appellant's consent? If so, the contents of the knapsack must be excluded. Given the military judge's finding regarding the relation between the contents of the knapsack and appellant's later statements, so too must appellant's confession be excluded, unless the military judge's finding in this respect is clearly erroneous. We conclude this particular finding is not clearly erroneous.[13]

The critical inquiry is whether appellant's consent to search was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." Wong Sun, 371 U.S. at 486. Thus, Wong Sun requires not merely that statements taken following an illegality meet the Fifth Amendment, U.S. Const. amend. V, standard of voluntariness, but that they also be sufficiently voluntary to attenuate the taint. Brown, 422 U.S. at 602. After all, it is not whether the evidence would have come to light "but for" the warrantless apprehension, but "whether, granting establishment of the

---

[13] The military judge found that "[t]he questioning of [appellant] . . . at NCIS was based solely on the evidence seized at 1248 Jackson Avenue."

20

primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 599 (citations omitted). In the instant case, if appellant's consent, albeit voluntary, is determined to have been obtained through exploitation of the illegal entry, it can not be said to be sufficiently attenuated from the taint of that entry.

In Brown, the Court established a framework for analyzing whether statements made following an unlawful arrest are sufficiently attenuated, or removed, from the taint of the unlawful act. There, police officers investigating a homicide broke into Brown's apartment without probable cause and without a search warrant while Brown was away. 422 U.S. at 592. During the course of the unlawful search, Brown returned. Id. The officers, still in the apartment, watched Brown through a window as he approached his door. Id. With guns drawn, they then surprised Brown and arrested him. Id. He was subsequently handcuffed and transported to the police station. Id. at 593. A little less than two hours after his arrest, and after being read his Miranda warnings, Brown made a statement implicating himself in the homicide. Id. at 594-95. After several more hours spent assisting the police in

finding his accomplice, Brown made a second statement to an Assistant State's Attorney.  Id. at 595.  This statement was made some seven hours after his initial arrest and was also preceded by Miranda warnings.  Id.  The statements were subsequently used to convict Brown at trial.

Holding that the statements should have been suppressed, the Court, relying on Wong Sun, noted that "the question of whether a confession is the product of free will [following an illegal arrest] must be answered on the facts of each case.  No single fact is dispositive."  Brown, 422 U.S. at 603.  The Court went on to explain that Miranda warnings, while an important factor, were not dispositive in determining whether the statements were obtained by exploitation of the illegal arrest.  "The voluntariness of the statement is a threshold requirement.  And the burden of showing admissibility rests, of course, on the prosecution."  Id. at 603-04 (citations omitted).  The Court set out three factors also relevant to the inquiry: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct . . . ."  Id. at 604 (emphasis added).  So, while the voluntariness of the statement is a threshold requirement to vindicate the Fifth Amendment interest, the Fourth Amendment interest arising

from the illegal seizure of the person is vindicated through a consideration of the three factors mentioned above.

Applying these principles to Brown's situation, the Court concluded that the time period between Brown's arrest and his first statement along with the lack of any intervening circumstance were insufficient to purge the taint of the illegal arrest. Brown, 422 U.S. at 604-05. In what appears to be its analysis under the third factor, the Court characterized the police officers' conduct as having "a quality of purposefulness." Id. at 605. "The arrest, both in design and in execution, was investigatory, [and had] the appearance of having been calculated to cause surprise, fright, and confusion" in the hope that some evidence might be discovered. Id.

While Brown involved a confession, this framework has been adopted to address issues of attenuation in the context of consent as well. Florida v. Royer, 460 U.S. 491, 501 (1983)(consent at issue, "statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will")(citing Wong Sun, 371 U.S. at 471; Brown, 422 U.S. at 601-02; Dunaway, 442 U.S. at 218-19); see United States v. Santa, 236 F.3d 662, 677-78 (11th Cir. 2000)(Brown factors used to determine whether voluntary consent was obtained

through exploitation of illegal seizure); United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994)(factors enunciated in Brown are "especially relevant to determining whether a consent is tainted by a preceding illegal search or seizure"); United States v. Chavez-Villarreal, 3 F.3d 124, 128 (5th Cir. 1993)(Brown factors used to determine whether causal chain between consent and prior illegality broken); United States v. McCraw, 920 F.2d 224, 230 (4th Cir. 1990)(even if consent to search was voluntary by Fifth Amendment standard, application of Brown factors required suppression); United States v. Taheri, 648 F.2d 598, 601 (9th Cir. 1981)(even assuming consent voluntary, it was necessary to apply Brown attenuation analysis).

## A.   The Brown Factors

The first two factors enunciated in Brown are more related to classic notions of attenuation.  See generally, 57A Am. Jur. 2D Negligence §§ 465, 491 (1989 & Supp. 2000)(discussing how temporal factor and an intervening circumstance affect remoteness and causation analysis). However, more so than the first two, the third factor is directed at police misconduct and whether such conduct has been employed to exploit the illegality.  The Supreme Court has identified this third factor as "particularly" important, presumably because it comes closest to satisfying the deterrence rationale for applying the exclusionary rule.

New York v. Harris, 495 U.S. 14, 23 (1990); see also United States v. George, 883 F.2d 1407, 1416 (9th Cir. 1989).  In fact, given the exclusionary rule's purpose of deterring police misconduct, this factor may be "the most important factor."  Dunaway v. New York, 442 U.S. 200, 226 (1979)(Rehnquist, J., dissenting).

"The primary justification for the exclusionary rule . . . is the deterrence of police conduct that violates Fourth Amendment rights."  Stone v. Powell, 428 U.S. 465, 486 (1976).  When police intentionally violate what they know to be a constitutional command, "exclusion is essential to conform police behavior to the law."  Harris, 495 U.S. at 23 (Marshall, J., dissenting).  However, despite its broad purpose, "the rule does not 'proscribe the introduction of illegally seized evidence in all proceedings or against all persons,'. . . but applies only in contexts 'where its remedial objectives are thought most efficaciously served.'"  Penn. Board of Probation and Parole v. Scott, 524 U.S. 357, 363 (1998)(quoting Stone v. Powell, 428 U.S. at 486; United States v. Calandra, 414 U.S. 338, 348 (1974)).  The Court has heralded the need for caution when employing the rule because it "deflects the truthfinding process" by depriving the factfinder of otherwise relevant and probative evidence.  Stone, 428 U.S. at 490.  Unwarranted application of the rule can result in a disparity between the error committed by the

police and the windfall afforded the accused that is "contrary to the idea of proportionality that is essential to the concept of justice." Id. "[A]lthough the rule is thought to deter unlawful police activity . . . if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." Id. at 491 (footnote omitted). Moreover, even the dissenters in Harris suggested that excluding evidence that is the "product of a good-faith misunderstanding of the relevant constitutional requirements . . . may result in deterrence of legitimate law enforcement efforts." Harris, 495 U.S. at 24 (Marshall, J., dissenting). Thus, in determining whether invocation of the rule is warranted, the Court insists that lower courts strike a balance between "the public interest in determination of truth at trial" and the "incremental contribution that might [be] made to the protection of Fourth Amendment values. . . ." Stone, 428 U.S. at 488.

With these principles in mind, we turn to the circumstances relating to SA Coyle's conduct in obtaining appellant's consent to search his bags. The first two Brown factors arguably tip in appellant's favor. SA Coyle's testimony indicates that the consent was given within 20 minutes after appellant's apprehension. Similarly, the only "intervening circumstances" between the apprehension and the

consent to search were (1) the administration of appellant's Article 31 rights, and (2) appellant's subsequent signed acknowledgement of the right to refuse consent.  Taken together, these facts allow a conclusion that the consent given was voluntary.  However, as Brown instructs, this is not dispositive of the issue of whether appellant's consent is sufficiently attenuated from the taint of the unlawful entry.

As for the third factor, there are several facts suggesting the absence of purposeful or flagrant conduct on the part of the NCIS agents in this case.  First, after apprehending appellant in the residence, SA Coyle obtained written consent to search appellant's bags before touching them.  As noted earlier, this one-page form advised appellant that he had the right to refuse the search in the absence of a search warrant.[14]  We are aware of no legal requirement for tendering such advice to a suspect.  Thus, the fact the NCIS agents provided the form with its warning mitigates against a conclusion that the police engaged in flagrant or purposeful conduct to exploit the illegal entry. See United States v. Ramos, 42 F.3d. 1160, 1164 (8th Cir.

---

[14] Specifically, the form (NISFORM 003/03-80) states: "I have been informed of my constitutional right to refuse to permit this search in the absence of a search warrant. In full understanding of this right, I have nevertheless decided to permit this search to be made."  Unlike many forms, this one is short and clear. It lists the date, items to be searched, start and ending times of the search and the searching officer [SA Coyle].

1994)(defendant's signing of consent form after unlawful traffic stop was "sufficiently an act of free will to purge the primary taint").

Second, SA Coyle stated that part of his basis for entering the premises to apprehend appellant was his concern for officer safety.[15]  We agree with the military judge's conclusion that the situation encountered by the NCIS agents did not rise to the level of exigent circumstances, as that term is understood in Fourth Amendment jurisprudence. However, SA Coyle's perception of the situation at the time of appellant's apprehension is relevant to the application of the third Brown factor.  In the real world of law enforcement, officers are often required to make split-second decisions resulting in choices, which, later subject to the frame by frame magnification of appellate review, do not meet Fourth Amendment muster.  Nonetheless, decisions taken in good faith, as that term is used in common vernacular, warrant our careful and measured consideration when we assess the purposefulness and flagrancy of police conduct.  While not rising to the level of "exigent circumstances", we do not find Coyle's concern for safety misplaced, nor evidence of flagrant conduct for the purpose of assessing the third Brown factor.

---

[15] Specifically, he testified at the Article 39(a), UCMJ, 10 USC 839(a), session that appellant "was near a room to his right that I didn't know what was present in the room, so for officer safety issues,

28

Finally, because SA Coyle erroneously viewed appellant as a nonresident of the home, he and the other NCIS agents waited outside because they understood they needed a <u>search</u> warrant before entering HM2 Guest's residence to search for appellant.  However, SA Coyle's testimony strongly suggests he believed the DD Form 553 was the functional equivalent of an <u>arrest</u> warrant.  Indeed, the military judge concluded as much, as did the court below.  The fact that we now hold that the DD Form 553 is not the equivalent of a civilian arrest warrant for the purpose of entering a civilian home does not suggest SA Coyle acted flagrantly or purposefully in relying on the form.

Unlike the officers in <u>Brown</u> and <u>Dunaway</u>, <u>supra</u>, there is no evidence in the record that SA Coyle knew he was committing a constitutional violation and notwithstanding that knowledge, intentionally entered unlawfully in order to pursue a quest for evidence "in the hope that something might turn up." <u>Brown</u>, 422 U.S. at 605.  Further, SA Coyle's three-foot intrusion across the threshold under the genuine, albeit erroneous, belief in the authority of the DD Form 553, does not suggest flagrant or purposeful conduct of the sort the Court in <u>Brown</u> was attempting to address.  In <u>Brown</u>, "[t]he impropriety of the arrest was obvious. . . ."

---

not knowing what was around that corner, I immediately took him into custody.  I didn't know if there were any weapons present or not. . . ."

29

<u>Id</u>.  We can not say the same for the circumstances surrounding appellant's apprehension.

While the first two factors are relevent to the analysis, ultimately, in this case a decision to exclude the evidence derived from appellant's consent comes down to a resolution of the issue on the third <u>Brown</u> factor.  Such a decision must be based on a determination whether SA Coyle's conduct is the type that the policy underlying the exclusionary rule was intended to deter.  It is not evident to us that the SA Coyle's intrusion across the threshold to apprehend appellant was designed to achieve any investigatory advantage he would not have otherwise achieved by simply waiting for appellant to exit the doorway onto the step outside.  The NCIS agent's conduct here is dramatically unlike the officers' conduct in <u>Brown</u> and <u>Dunaway</u>.  Here, SA Coyle had probable cause and the inherent authority to apprehend appellant had appellant traversed the three feet between himself and SA Coyle.  In short, appellant's apprehension did not have "a 'quality of purposefulness' in that it was an 'expedition for evidence' admittedly undertaken in the hope that something might turn up." <u>Dunaway</u>, 442 U.S. at 218 (quoting <u>Brown</u>, 422 U.S. at 605). Nor, was their conduct designed to cause "surprise, fright and confusion."

Therefore, we hold that appellant's consent to the search of his knapsack was a voluntary act of free will. Further, we hold that his consent was not the exploited product of the unlawful entry into HM2 Guest's civilian residence, and thus, it was sufficiently attenuated from the taint of the prior illegality.

Thus, it follows that since we hold that appellant's consent to the search of his bags was valid, the subsequent seizure of them was valid as well because, in this instance, one can not search without first seizing. Similarly, since the seizure of the bags at the residence was valid, the later search of those bags at the field office was valid.

### B. Appellant's Statement at the Field Office

The manner in which the contents of the bags may have been used to obtain appellant's confession does not alter the admissibility of the confession. That determination rests solely on the relationship between the inculpatory statements and the earlier unlawful entry by the NCIS agents. Against this backdrop, the rationale of Harris, supra, compels our conclusion that appellant's statement obtained at the field office was properly admitted.

In Harris, police officers developed probable cause that the defendant had committed a murder, yet they failed to seek either a search or arrest warrant. 495 U.S. at 15. Nonetheless, they proceeded to the defendant's home and

presented their guns and badges.  Id.  The defendant allowed the officers in, and subsequently confessed to the murder. Id. at 15-16.  The officers then transported Harris to the station house where he was administered his Miranda rights. Id. at 16.  There he made a second statement confessing his responsibility for the murder.  Id.  The issue before the Court was the admissibility of the second statement taken at the station house.  Id.  After reviewing its rationale in Payton, supra, the Court refused to exclude the confession reasoning that the rule in Payton "was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." Harris, 495 U.S. at 17.  The crux of the Court's holding is that a warrantless arrest of a suspect in his home does not render unlawful continued custody of the suspect once he is removed from the house.  Id. at 17-18.  Similar analysis applies in this case because appellant was a resident of HM2 Guest's residence.  As in Harris, because the agents in this case had probable cause to apprehend appellant, he was not in unlawful custody when he was removed to the field office, given his Article 31 rights and allowed to speak.  Thus, the statement was properly admitted.

III

Post-Trial Delay

32

<u>United States v. Khamsouk</u>, No. 01-0387

Appellant's trial concluded on August 22, 1997. The trial counsel examined the 668-page record of trial on September 26, 1997. However, the military judge did not authenticate the record until October 31, 1998, over 13 months later. The convening authority took action in the case on April 15, 1999, over four months later, and nearly 20 months after the court-martial.

The Court of Criminal Appeals, relying on our precedent in this area, found the military judge's delay in authenticating the record unexplained. 54 MJ at 748. However, it expressly rejected as speculative appellant's claim that this delay prejudiced his chances of receiving clemency and parole. Appellant makes the identical complaint in his appeal to this Court.

For the reasons set forth in our recent decision of <u>United States v. Tardif</u>, __ MJ __ (2002), we conclude that remand is appropriate in this case.

                              DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is set aside. The record of trial is returned to the Judge Advocate General of the Navy for remand to that court for reconsideration in light of this opinion. Thereafter, Article 67, UCMJ, 10 USC § 867 will apply.

CRAWFORD, Chief Judge (concurring in part and dissenting in part):

For the following reasons, I concur in the result as to the motion to suppress:

(1)  The police needed only a Department of Defense (DD) Form 553 on which the commanding officer certified under oath probable cause to believe that appellant was a deserter because they already had reasonable cause to believe that appellant was "liv[ing]" at Guest's apartment.  Payton v. New York, 445 U.S. 573, 602-03 (1980); see also Steagald v. United States, 451 U.S. 204, 214 (1981).

(2)  Assuming the DD Form 553 does not satisfy the requirement for an arrest warrant, and that a search warrant was required, exigent circumstances would excuse the lack of either warrant.

(3)  The rights warning severed any illegality.

                              FACTS

On December 18, 1996, Special Agent (SA) Edward M. Coyle, of the Naval Criminal Investigative Service (NCIS), Norfolk, Virginia, field office, initiated a credit card theft and fraud investigation against appellant, who was then known as "SHSA Anthony Khamsouk."  SA Coyle soon learned that appellant was absent without leave from the Navy.  On January 6, 1997, the commanding officer executed a DD Form 553, which declared

appellant a "Deserter/Absentee Wanted by the Armed Forces."  The

DD Form 553 indicated that appellant had, in violation of

Article 85, UCMJ, 10 USC § 885, "without authority and with

intent to remain away therefrom permanently," absented himself

on December 13, 1996.  The DD Form 553 was executed by the

commanding officer based on personal knowledge and under the

penalty of perjury that appellant was a deserter.

During January 1997, the fraud investigation into

appellant's criminal schemes expanded into other financial

dealings.[1]  At some point prior to February 5, 1997, SA Coyle

learned that appellant had attempted to use an automated teller

machine card in St. Louis, Missouri, and therefore, he contacted

appellant's command to obtain a copy of the DD Form 553.  In

early February 1997, SA Coyle interviewed two citizens who

indicated that appellant was involved in a credit card fraud

scheme.  One of these citizens told SA Coyle that appellant was

staying at the home of Hospital Corpsman Second Class (HM2) Tom

Guest on Jackson Avenue.  The citizen also told SA Coyle that

appellant always traveled with a knapsack, and that this

---

[1]  Subsequent investigation, in the spring and summer of 1997, revealed that appellant's fraudulent schemes had cut a wide swathe across the United States, Japan, and Germany.  NCIS agents learned in March, 1997, that appellant's true identity was Toro Khamsouk, and that he was suspected of having been a member of an Asian gang in the Portland, Oregon, area. Investigative leads concerning appellant's fraudulent use of stolen credit cards were followed throughout the country, to inclue California, Maine, Oregon, and Missouri.  Secret Service agents tracked down and interviewed the real Anthony Khamsouk.  In all, more than 20 law enforcement agents were involved in the investigation and the collection of far-flung evidence.

knapsack might contain evidence of credit card fraud.  In addition, the citizen stated that appellant was likely moving to Los Angeles in the near future.  As set forth below, these facts were later corroborated by HM2 Guest.

Based on this information, SA Coyle, accompanied by three other NCIS agents, established surveillance of HM2 Guest's home on February 5, 1997.  HM2 Guest owned the home on Jackson Avenue, which was a private, off-base residence.  SA Coyle and his colleagues did not plan to enter HM2 Guest's home to apprehend appellant; rather, they were waiting for appellant to leave the home because they had received information that he had an appointment at about 2:00 p.m.  The investigators suspected appellant was involved in a fraudulent scheme using numerous credit cards with someone else's identity.  Presenting one of these cards, appellant would call a restaurant and reserve a dinner for a group of about ten people.  However, just before the appointment, he would call the restaurant and tell them that he could not attend but would treat his friends.  He would then ask the restaurant to charge the dinner to his credit card and add a healthy tip, sometimes in excess of 25 percent.  Because the fraudulent use of the credit cards happened numerous times in the Norfolk area, the agents knew others were involved.  Even so, SA Coyle at this point testified that he believed he could

not enter HM2 Guest's residence to apprehend appellant without a search warrant.

At approximately 1:20 p.m., SA Coyle observed two men leave HM2 Guest's house. He could not determine whether either man was appellant, so he stopped them both and asked for their identification. Neither man was appellant. One of the men, HM2 Guest, identified himself as the owner of the house. HM2 Guest testified that the NCIS agents arrived in "two or three cars" and told them to "freeze." He testified further that the NCIS agents apparently believed the other man was appellant, and therefore, they placed him up against HM2 Guest's car. SA Coyle identified himself and asked HM2 Guest if he knew appellant's whereabouts. SA Coyle explained that he had an arrest warrant for appellant, and HM2 Guest told him that appellant was inside his home. SA Coyle asked HM2 Guest for permission to enter the house to arrest appellant, but HM2 Guest demurred, saying that he "would prefer" to bring appellant out himself.

At that point, SA Coyle followed HM2 Guest to the front door and waited on the front porch, just outside the doorway. The door remained open, and HM2 Guest stepped into the foyer. While standing in the passageway between the foyer and the living room, HM2 Guest called out to appellant in the living room, telling him to "come to the door" because someone wanted to speak with him. In response to HM2 Guest's summons,

4

appellant came toward the door.  SA Coyle saw appellant as he peeked around from the living room, approximately three feet away from the front door.   At this point, he was concerned about his safety and the safety of the other officers based on appellant's criminal conduct and use of multiple accomplices in the local area.  When appellant peered around the counter, SA Coyle had no knowledge who was present or what weapons were in the residence and might be used.  SA Coyle asked appellant if he was "Anthony Khamsouk," and then told him he was under arrest. During this exchange, or immediately afterwards, SA Coyle stepped into the foyer and took appellant into custody.  SA Coyle had the DD Form 553 in his possession when he apprehended appellant.  The apprehension alleviated the agent's concern for his safety and the safety of the other officers, as well as for the destruction of items he saw in the room.

SA Coyle then moved appellant into the living room and sat him down on the sofa.  After advising him of his rights under Article 31, Uniform Code of Military Justice (UCMJ), 10 USC § 831, SA Coyle asked appellant if a knapsack sitting near the sofa was his, and appellant said it was.  Appellant was asked if the knapsack was the only belonging he had in the house, and he replied affirmatively.  HM2 Guest then stated that appellant was not being truthful, and that he had another bag upstairs.  HM2 Guest volunteered to go get the bag for the NCIS agents.  He

5

also executed a "Permissive Authorization for Search and Seizure" form, which states that the signatory has been informed of his "constitutional right to refuse to permit the search in the absence of a search warrant. . . ." HM2 Guest led another NCIS agent to the duffel bag, which was located on the second floor.

In the meantime, SA Coyle asked appellant to execute a consent form identical to the one HM2 Guest signed. Appellant executed the form while he sat in the living room. Although the bags were subsequently subjected to a cursory examination for weapons at the scene, neither the knapsack nor the duffel bag were searched at HM2 Guest's home.

Appellant was taken to the NCIS field office and re-advised of his Article 31 rights using the standard NCIS rights advisement and waiver form. Appellant indicated that he understood his rights, initialing each one, and thereafter signed and dated the waiver. Appellant was not similarly re-advised of his search and seizure rights.

Appellant falsely identified himself as "Anthony Khamsouk" and provided a military identification card bearing his picture and that name. A search of appellant yielded an American Express card in the name of Eric Johnson, and a Mastercard from his shirt pocket in the name of Virginia Green. A date book was taken from appellant which contained several credit card

receipts.  SA Coyle then interviewed appellant about items taken from the knapsack and duffel bag.  Appellant admitted that he had obtained a list of credit card numbers from a purported member of an Asian gang in Portland, Oregon, and that he had used these credit card numbers to make credit purchases at restaurants and clothing stores, and to purchase airline tickets.  It took NCIS agents more than a day to inventory nearly one hundred items of evidentiary value taken from the knapsack and duffel bag.

HM2 Guest testified at the hearing pursuant to Article 39(a), UCMJ, 10 USC § 839(a), that appellant was staying with him for a few days.  He stated that he was not aware of appellant having any other residence, and that appellant was using his house as his "home base."  When asked if he had been willing to assist SA Coyle in apprehending appellant, HM2 Guest explained that if appellant had done something "wrong[,] and they had a warrant for his arrest," then he was willing to bring him out of the house so that appellant could deal with them personally.  HM2 Guest also described appellant as appearing "scared" when he peeked around the living room doorway in response to HM2 Guest's summons.

SA Coyle testified that he "frequently apprehended deserters based on information provided by computer read out that there was a warrant issued for the arrest of a subject through NCIC," but,

7

in this particular case, he had only a copy of the DD Form 553 with him at the time of apprehension.  SA Coyle also stated that he was concerned about safety because he did not know whether there were any weapons in the house, or whether appellant was carrying a weapon; therefore, when he saw appellant peek around the corner of the living room, he decided to immediately take custody of him.

### DISCUSSION

This Court accepts the findings of the military judge unless clearly erroneous.  See, e.g., United States v. Hollis, 57 MJ 74 (2002); however, the issues in this case -- the right to privacy, the warrant requirement, the exigent circumstances exception, and the fruit of the poisonous tree doctrine -- are all reviewed under a de novo standard of review.  Cf. Ornelas v. United States, 517 U.S. 690 (1996).

Appellant's rights in this case, like a defendant in a federal or state court case, stem from the Constitution, statutes, rules of procedure (in the military, called Rules for Courts-Martial), and the common law.  See, e.g., United States v. Lopez, 35 MJ 35 (CMA 1992).  While the Supreme Court has assumed the Bill of Rights applies to the military, see, e.g., Davis v. United States, 512 U.S. 452, 457 n.* (1994), this Court has held that they apply absent military necessity or

8

operational needs.  United States v. Jacoby, 11 USCMA 428, 430-31, 29 CMR 244, 246-47 (1960).

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It contains two clauses:  the Warrant Clause and the Reasonableness Clause.  Over the years, the Supreme Court has recognized the "cardinal principle that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions.'"  Mincey v. Arizona, 437 U.S. 385, 390 (1978)(quoted in California v. Acevedo, 500 U.S. 565, 580 (1991)); see also Horton v. California, 496 U.S. 128, 133 n.4 (1990).  One of these exceptions is a search incident to a lawful arrest.  To prevent any abuse of this exception, the Supreme Court reinforced the Warrant Clause in Payton.

### Payton/Steagald

In Payton, the Court held that absent exigent circumstances, "the Fourth Amendment ... prohibits the police

from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." 445 U.S. at 576. The Court recognized "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603. This was a recognition of the special privacy interest in one's home. While the Court permits the use of an arrest warrant for nonconsensual entry when an individual lives at the house, Steagald requires a search warrant, rather than merely an arrest warrant, for a nonconsensual entry into a third party's residence when the individual sought by law enforcement authorities is living there. 451 U.S. at 213-14.

In 1984, R.C.M. 302(e)(2) was added to the Manual for Courts-Martial to adopt "the warrant requirement of Payton ... conforming the procedure to military practice." Drafters' Analysis of R.C.M. 302(e), Manual for Courts-Martial, United States, 1984, at A21-13. This provision remains unchanged today. R.C.M. 302(e)(2), Manual for Courts-Martial, United States (2000 ed.). R.C.M. 302 does not define "resident," the language used in both Payton and Steagald, in terms of where a suspect lives.

What constitutes "living at the house?" Does it equate to the requirements for standing? Must the individual be the

lessee or the owner, or something in between?  Lines must be drawn.  It may be that the line should be drawn between a guest in a household and someone who is staying for an agreed-upon duration and could consent to a search of the premises, but that has not been decided to date.  The dissenters in Steagald suggested a fairly short time-line:  "If a suspect has been living in a particular dwelling for any significant period, say a few days, it can certainly be considered his 'home' for Fourth Amendment purposes...."  451 U.S. at 230-31 (Rehnquist, J., dissenting).

In this case, appellant was more than an overnight guest.  Even if he was an overnight guest, the police had probable cause to believe that he was living at the house.  Appellant had been living in HM2 Guest's house for a number of days and planned to leave three or four days after the search.  Thus, Payton, rather than Steagald, would apply.  Because appellant was living at the house, a warrant to search was not needed for the entry in this case.  See, e.g., Watts v. County of Sacramento, 256 F.3d 886, 889-90 (9th Cir. 2001); see also Werbicki v. County of Los Angeles, 2002 U.S. App. LEXIS 3428 (9th Cir. 2002).  The DD Form 553 was sufficient.

## Exigent Circumstances

An exigent circumstance is an exception to both Payton and Steagald.  See Kirk v. Louisiana, ___ U.S. ___, 122 S. Ct. 2458

11

(2002)(state court reversed because the officer had neither an arrest warrant nor a search warrant, and the state court "declined to decide whether exigent circumstances had been present"); cf. Maryland v. Buie, 494 U.S. 325, 327 (1990). A warrantless entry[2] will be sustained when the circumstances were such as to lead a person of reasonable caution to conclude that evidence of a crime would be found on the premises, and that such evidence would probably be destroyed within the time necessary to obtain a search warrant. See Roaden v. Kentucky, 413 U.S. 496, 505 (1973); United States v. Mitchell, 12 MJ 265 (CMA 1982); United States v. Elkins, 732 F.2d 1280 (6th Cir. 1984). Moreover, Mil.R.Evid. 315, Manual, supra, entitled "Probable cause searches," provides specific guidance with respect to exigent circumstances. Mil.R.Evid. 315(g) states, in pertinent part:

> A search warrant or search authorization is not required under this rule for a search based on probable cause when:
>
> (1) Insufficient time. There is a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought. . . .

---

[2] I will use the term "warrantless entry," for purposes of this section of my opinion, because SA Coyle did not have a search warrant for HM2 Guest's home. As set forth above, under the facts of this case, I do not believe that he needed both an arrest and a search warrant to make a reasonable entry into HM2 Guest's home.

In addition, Mil.R.Evid. 316(d)(4)(B), Manual, supra, explicitly allows the seizure of evidence in the case of exigent circumstances, as defined in Mil.R.Evid. 315(g).  Mil.R.Evid. 316(f), the "catch-all" provision, provides that "[a] seizure of a type not otherwise included in this rule may be made when permissible under the Constitution of the United States as applied to members of the armed forces."

Exigent circumstances may arise when law enforcement officers "tip their hand" and reveal the existence of an investigation, or those officers reasonably believe that the "possessors of the contraband" are aware that the police are "on their trail."  See, e.g., United States v. Rubin, 474 F.2d 262, 268 (3d Cir. 1973), cert. denied, 414 U.S. 833 (1973); United States v. Parra, 2 F.3d 1058 (10th Cir. 1993)(exigent circumstances arose when agents believed that other suspects may have observed them from a partially open door arresting a confederate and, as a result, might begin destroying evidence); United States v. Almonte, 952 F.2d 20 (1st Cir. 1991)(commotion resulting from convergence of agents following undercover drug purchase justified warrantless initial sweep of defendant's apartment where apartment was located across the street from drug transaction); United States v. Socey, 846 F.2d 1439 (D.C. Cir. 1988)(exigent circumstances justified entry when agents had a reasonable belief that third persons inside a private dwelling

were aware of an investigatory stop or arrest of a confederate outside the premises and might see a need to destroy evidence); United States v. Wulferdinger, 782 F.2d 1473 (9th Cir. 1986)(exigent circumstances justified warrantless entry where confederate's failure to return to premises, due to arrest, might cause those inside to dispose of evidence); United States v. Gardner, 553 F.2d 946 (5th Cir. 1977) (narcotics-related arrest outside home, involving agents in five cars with guns drawn, coupled with knowledge that drugs were inside the home and a female suspect remained inside, provided agents with reasonable belief that an immediate entry was necessary to prevent disposal of drugs inside home).

For example, in United States v. Elkins, the Sixth Circuit held that a warrantless entry was justified once a surveillance team had revealed their presence and a reasonably cautious person would have concluded that Elkins had seen the officers and, therefore, would "prudently proceed to dispatch all possible evidence." 732 F.2d 1280, 1285 (6th Cir. 1984). In that case, officers had probable cause to believe that Elkins was involved in narcotics trafficking, had recently participated in a controlled delivery of cocaine, and that he was currently in his residence. Id. at 1284. Agents established surveillance around Elkins's home and began the process of obtaining a search warrant. Id. at 1283-84. Two cars then drove down Elkins's

14

driveway, including a vehicle associated with Elkins, and the "entire surveillance team of four or five cars" converged on the driveway to halt the departing vehicles. Id. at 1283. After determining that Elkins was not in either car, the agent in charge determined that the occupants of the house had probably seen the commotion and were in the process of destroying evidence. Id. Agents then entered the house, made a protective sweep, and took several individuals into custody. Id. at 1283-84. The Court found that after causing the commotion in the driveway and discovering that neither person arrested was Elkins, "a reasonably cautious person would quickly conclude that Elkins, who was still in the house, had seen the hubbub, realized the situation, and would prudently proceed to dispatch all possible evidence." Id. at 1285. Moreover, the court concluded, that evidence would reasonably be expected to include additional cocaine, books and records of the enterprise, and drug paraphernalia. Id. The court further explained that once the agents entered the premises, they were required to sweep for weapons and the safety of all concerned, and that this was done with minimal intrusion. Id.

In United States v. Mitchell, this Court arrived at the same conclusion in a case with similar facts. 12 MJ 265 (CMA 1982). In that case, an informant provided the Army Criminal Investigation Command (CID) with information indicating that

Mitchell had heroin in his off-post apartment in Germany and he would have it until he left for work the next morning. <u>Id</u>. at 266. A CID agent sent the informant, with marked money, to make a controlled purchase of heroin from Mitchell. <u>Id</u>. The informant completed the transaction inside the apartment and reported back to the agent. <u>Id</u>. The agent then repeatedly attempted to coordinate with the German police and have them conduct a search of the premises. <u>Id</u>. at 267. The German police did not respond promptly, so the agent went to Mitchell's apartment to secure it until the German Police could perform a search. <u>Id</u>. The agent feared that Mitchell would be leaving for work because it was almost 7:00 a.m. The agent asked the informant to ring Mitchell's doorbell in order to gain entry through the front door of the apartment building. <u>Id</u>. When the informant subsequently entered Mitchell's apartment, having been invited by Mitchell, the informant left the front door open. <u>Id</u>. While the agent waited in the hallway outside Mitchell's front door, his walkie-talkie began to sound. <u>Id</u>. At that point, "Mitchell stuck his head back out the door" and the agent told him he was under apprehension. <u>Id</u>. Mitchell pulled back into the apartment and the agent told him to have a seat until the German police arrived. <u>Id</u>. Mitchell subsequently tried to throw evidence out the window. <u>Id</u>.

While the military judge declined to uphold the arrest of Mitchell in the apartment based on a theory of hot pursuit, the judge concluded that "exigent circumstances existed which justified apprehending Mitchell inside his private dwelling." Id. at 268. The judge observed that "if the agent had taken the time to get the proper authorization from an appropriate commander, ... the lapse of time required to do so would have, in this case, jeopardized the possibility of recovering the recorded money." Id. The military judge explained further that

> it is not required under those circumstances for the agent to ... speculate on when or even if the accused would exit his dwelling so that the apprehension could be made outside in a public place. Even though the agent had some reason to believe that he might come out[,] it was by no means certain that he would within any reasonable time. And that[,] coupled with the uncertainty as to what might be happening to evidence in the apartment in the meantime, I think, justifies the warrantless entry to make the apprehension.

Id.

This Court explicitly held in Mitchell that the phrase "exigent circumstances," as used in Payton, was intended to encompass the danger of destruction of evidence. Id. at 270. Thus, the Court affirmed the trial judge's conclusion that the warrantless entry into the apartment was fully justified by "exigent circumstances." This Court surmised that if Mitchell had not been promptly apprehended, and the agent had continued his surveillance, "there was the risk that [the] appellant might

17

notice that he was being watched or might see the German police arriving" and be alerted to destroy the contraband before it could be discovered.  Id.

Likewise, in this case, exigent circumstances arose once SA Coyle and his colleagues, "in two or three cars," approached HM2 Guest and his friend outside the Jackson Avenue house.  Once the NCIS agents had "tipped their hand," SA Coyle could have reasonably believed that appellant would have noticed what was happening out front and would destroy evidence of his credit card schemes.  SA Coyle knew before he went to Jackson Avenue that appellant was suspected of being involved in an extensive fraud scheme, and that he always carried a knapsack that might contain evidence of the fraud.  It is reasonable to assume that SA Coyle would have deduced that the evidence contained in the knapsack might include items that are easily destroyed, such as documents, credit card receipts, or credit card number information.  SA Coyle knew that appellant was a deserter, and that appellant likely understood that the Navy would be looking for him.[3]  Moreover, once appellant tentatively peeked his head

---

[3] In United States v. Ayala, 26 MJ 190, 193 (CMA 1988), this Court held, inter alia,  that the appellant's "actions in putting in for retirement and clearing his quarters were strong indications of an intention on his part to flee."  This was one of two factors considered in determining that exigent circumstances existed to justify appellant's immediate apprehension without authorization of his commander.  Likewise, because appellant was a deserter, and had deliberately absconded from the Navy, SA Coyle could reasonably have believed that appellant might flee the area before he could obtain a search warrant.

around the corner of the living room, with a scared look on his face, SA Coyle had even more reason to believe that, if allowed to, appellant would attempt to destroy evidence of his crimes.

This also is not a case where law enforcement officers "manufactured" exigent circumstances to obtain entry into HM2 Guest's home. See United States v. Tarazon, 989 F.2d 1045, 1050 (9th Cir. 1993)(officers did not create exigent circumstances as means of obviating need for obtaining warrant when they believed they had probable cause to enter only after they went to establishment and circumstances arose indicating that suspects inside might suspect presence of law enforcement and destroy evidence). To the contrary, SA Coyle did not know whether appellant was at the Jackson Avenue house until HM2 Guest told him so. At that point, the "cat was out of the bag, and exigent circumstances arose justifying the entry into the house.

It is worth noting that the intrusion here was minimal and tailored to the circumstances as they developed. The NCIS agents did not conduct a search of HM2 Guest's house; rather they merely seized appellant's knapsack, which was found near appellant, and his duffel bag, which HM2 Guest located for the NCIS agents. To the extent that HM2 Guest's privacy interests were invaded that day, the intrusion was remarkably circumscribed and reasonable in the face of rapid developments. Indeed, if NCIS agents had pursued an alternate course of action

19

and secured the Jackson Avenue house while they sought a search warrant, HM2 Guest's privacy interests as a resident and homeowner would have been invaded in a much more onerous fashion.  At a minimum, he would have been prevented from enjoying the interior of his house for a much longer period of time.  It is also reasonable to assume that, had the NCIS agents obtained a search warrant, the search for evidence would have taken much longer and would have involved a larger area of the house.  See Chambers v. Maroney, 399 U.S. 42, 51 (1970)(Court unwilling to characterize an immediate search as a greater intrusion than a seizure and an indefinite immobilization while securing warrant); United States v. Johnson, 862 F.2d 1135, 1139 (5th Cir. 1988)(detaining suspects while obtaining search warrant more intrusive than immediate search).

Because the NCIS agents acted reasonably in the face of exigent circumstances, the evidence seized as a result of that apprehension was properly admitted by the military judge.

## Exclusionary Rule

The exclusionary rule has been applied by federal, state, and military courts to violations of the Fourth Amendment right to privacy, violations of the Fifth Amendment, U.S. Const. amend. V, due process and self-incrimination clauses, and Sixth Amendment, U.S. Const. amend. VI, right to counsel.  In describing the application of the exclusionary rule, the courts

have, over the years, declined to apply the exclusionary rule where there is attenuation, an independent source, or inevitable discovery.  Regardless of the violation, courts have applied the Brown v. Illinois, 422 U.S. 590 (1975), factors.  Thus, I agree with the majority in applying the Brown factors to this case.

On Issue III, I dissent for the reasons set forth in my separate opinion in United States v. Tardif, ___ MJ ___ (2002).

GIERKE, Judge (concurring in part and dissenting in part):

I agree with the lead opinion's disposition of Issue III. With respect to Issues I and II, I agree with the lead opinion's conclusion that appellant's apprehension was unlawful, because a DD Form 553 is not the equivalent of a civilian arrest warrant. However, I disagree with the lead opinion's resolution of Issues I and II. Finally, I agree with Judge Effron's conclusion that all three prongs of the attenuation analysis set out in Brown v. Illinois, 422 US 590 (1972), would weigh in appellant's favor if it were applicable to this case.

The lead opinion's attenuation analysis rests on the premise that the Government met its burden of proving that appellant's consent was voluntary. ___ MJ at (23, 29-30). I disagree with that premise. Thus, in my view, the Brown attenuation analysis is not applicable to this case.

The predicate question is whether appellant voluntarily consented to the search. The lead opinion recognizes that "if appellant's consent, albeit voluntary, is determined to have been obtained through exploitation of the illegal entry, it can not be said to be sufficiently attenuated from the taint of that entry." ___ MJ (22). However, if appellant's consent was not truly voluntary, the search was illegal, and we do not reach the issue of attenuation.

In my view, the military judge's finding that appellant voluntarily consented was clearly erroneous. See United States

v. Radvansky, 45 MJ 226, 229 (1996).  A major factor undermining the military judge's finding is the short time between the unlawful apprehension and appellant's execution of the consent form.  Appellant was caught by surprise when Special Agent Edward M. Coyle burst into Hospital Corpsman Second Class (HM2) Tom Guest's home, followed by three other Naval Criminal Investigative Service (NCIS) agents.  While surrounded by four NCIS agents, appellant signed the preprinted consent form within 15-20 minutes of his apprehension.  Although the record reflects that appellant was orally advised of his Article 31, Uniform Code of Military Justice, 10 USC § 831, rights, there is no evidence that he was orally advised of his right to refuse to consent to the search.  The only evidence that appellant was aware of his right to refuse to consent is the small print on the consent form.  In contrast to the Article 31 rights advisement form, where appellant indicated his understanding of his rights by placing his initials beside the listing of each right, appellant did not similarly initial the statement on the consent form acknowledging his awareness of his right to refuse to consent to the search.

The Government had the burden of proving by clear and convincing evidence that appellant voluntarily consented.  Mil. R. Evid. 314(e), Manual for Courts-Martial, United States (2000 ed.).  Because I believe that the Government failed to meet its burden of proving voluntary consent, I do not reach the attenuation issue.

Finally, I believe that the illegal apprehension and searches made appellant's subsequent confession inadmissible. Although appellant was warned of his Article 31 rights, he was not given a cleansing warning. Once the incriminating evidence was seized during the searches of the knapsack and the duffel bag, the Government had a heavy burden to show that appellant's subsequent waiver not only met the standard of voluntariness under the Fifth Amendment, U.S. Const. amend. V, and Article 31, UCMJ, but that it was "sufficiently an act of free will to purge the primary taint" of the previous unlawful apprehension and search. Brown, 422 U.S. at 602, (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)). In my view, the Government failed to carry its burden, and the military judge erred by admitting the confession into evidence.

I would set aside the affected findings and sentence and authorize a rehearing.

EFFRON, Judge (concurring in part and dissenting in part):

I agree with the lead opinion's conclusion that, at a minimum, a remand is necessary to address the violation of appellant's right to reasonably prompt post-trial processing. I also agree with the lead opinion's conclusion that under the Fourth Amendment, U.S. Const. amend. IV, and RCM 302, Manual for Courts-Martial, United States (2000 ed.), a Department of Defense (DD) Form 553 is not the equivalent of a civilian arrest warrant. For the reasons set forth below, I respectfully disagree with the lead opinion's conclusion that no relief is warranted with respect to the violation of appellant's rights under the Fourth Amendment and R.C.M. 302.

The Naval Criminal Investigative Service (NCIS) agents entered a private home without a valid warrant to apprehend appellant for unauthorized absence. ___ MJ at (19-20). According to the military judge, their subsequent search of appellant's belongings was not justified by exigent circumstances, such as protection of the safety of the NCIS agents, and did not otherwise constitute a valid search incident to apprehension. In light of these considerations, the critical issue in this case is whether the Fourth Amendment violation impermissibly tainted appellant's subsequent consent to the search of his belongings.

1

United States v. Khamsouk, No. 01-0387/NA

The lead opinion relies on Brown v. Illinois, 422 U.S. 590 (1975), for the analytical framework.  Brown involved the admissibility of a confession obtained after an illegal arrest. As noted in the lead opinion, the Supreme Court identified the critical issue as whether the statement was "the product of free will," which it viewed as an issue to be "answered on the facts of each case" in which "[n]o single fact is dispositive."  ___ MJ at (22)-(23)(quoting Brown, 422 U.S. at 603).  The Court emphasized the importance of considering admissibility "in light of the distinct policies and interests of the Fourth Amendment," and identified three relevant factors: (1) "[t]he temporal proximity of the arrest and the confession"; (2) "the presence of intervening circumstances"; and (3) "particularly, the purpose and flagrancy of the official misconduct."  Brown, 422 U.S. at 604.  In Brown, despite the fact that appellant's statements were preceded by rights warnings under Miranda v. Arizona, 384 U.S. 436 (1966), the Court concluded that under the particular circumstances of the case, the government had failed to meet its burden of showing that the evidence should have been admitted. 422 U.S. at 604-05.

In the present case, the lead opinion applies the Brown factors by analogy to assess whether appellant's consent to the seizure and search of his knapsack and duffel bag, and the confession obtained as a result of that search, were the product

2

of circumstances sufficiently attenuated from the Fourth
Amendment violations.  It proceeds on the assumption that the
first two factors -- temporal proximity and intervening
circumstances -- favor appellant.  See ___ MJ at (26).  Assuming
that Brown is applicable to the present case,[1] the validity of
the consent under the lead opinion's analytical framework turns
on Brown's third factor -- the purpose and flagrancy of the
official misconduct.

The Government bears the burden of demonstrating
attenuation of appellant's consent from the preceding
illegalities by clear and convincing evidence.  Mil.R.Evid.
314(e)(5), Manual, supra; see also Florida v. Royer, 460 U.S.
491, 507-08 (1983).  For the reasons set forth below, the
Government did not carry its burden in the present case.


### DISCUSSION

The draft opinion concludes that the consent was
sufficiently attenuated under Brown's third factor, relying on
Special Agent (SA) Edward M. Coyle's belief that he had a valid
warrant to apprehend appellant for unauthorized absence, his
concern for safety during the apprehension, and his use of a

---

[1] But cf. People v. Robbins, 369 N.E.2d 577, 581 (1977)(holding that the Brown analysis ordinarily is not necessary when an illegal search constitutes the "poisonous tree" that produces a confession because "[c]onfronting a suspect with illegally seized evidence tends to induce a confession by demonstrating the futility of remaining silent.")

form that advised appellant of his right to refuse permission for the search.  ___ MJ at (30-35).  SA Coyle's actions, however, went far beyond these considerations, providing substantial evidence of purposeful and flagrant conduct in disregard of applicable restrictions on search and seizure.

### 1.  Purpose

The record indicates that although SA Coyle believed he had a valid warrant to apprehend appellant for desertion, the primary purpose of the law enforcement activity at issue was to search and seize appellant's knapsack in furtherance of the ongoing fraud investigation.  SA Coyle had been advised that "whenever [appellant] went out, he carried . . . a black knapsack, which was known to carry . . . fraudulent credit cards or stolen credit cards and credit card receipts."  When SA Coyle went to the private residence to apprehend appellant, he knew that he lacked probable cause to obtain a warrant to search for evidence of the aforementioned financial crimes, and that he could not seize appellant inside a third party's home without a search warrant.  His plan was to set up surveillance on the private residence, wait for appellant to depart, apprehend him outside, and seize the knapsack incident to the apprehension. See Payton v. New York, 445 U.S. 573 (1980); Wilson v. Layne, 526 U.S. 603, 611 (1999).  Despite his stated belief that he

4

could not enter the premises without a search warrant, SA Coyle entered anyway, in the absence of either exigent circumstances or the homeowner's consent.

Even if SA Coyle had a reasonable belief that the DD Form 553 was a substitute for a civilian arrest warrant, his actions exceeded the scope of authority that would have inhered in an arrest warrant, including the limited authority to take protective actions.  See Discussion, infra part 2.  Once SA Coyle apprehended appellant three feet inside the home of Hospital Corpsman Second Class (HM2) Tom Guest, the arrest was complete and further entry was not authorized.  See Payton, supra; United States v. Albrektsen, 151 F.3d 951, 954-55 (9th Cir. 1998); see also Dunaway v. New York, 442 U.S. 200, 218 (1979)(quoting Brown, 422 U.S. at 605).[2]  The disregard of well-established principles of law by an experienced law enforcement officer underscores the purposeful and flagrant nature of the Fourth Amendment violations.

---

[2] It is noteworthy that the military judge expressly found that, at the time of the officers' entry:

> No exigent circumstances existed requiring immediate apprehension of [Appellant].  [Appellant] made no effort to escape and engaged in no peculiar actions.  NCIS knew of no evidence that could be destroyed or secreted away, and [SA] Coyle had with him enough back up agents to secure the premises and obtain a separate warrant had he chosen to do so.

## 2. Safety

When executing an arrest warrant in a home, law enforcement officials may conduct a protective sweep incident to the arrest if they have "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[s] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others." Maryland v. Buie, 494 U.S. 325, 327 (1990)(quoting Michigan v. Long, 463 U.S. 1032, 1049-50 (1983); Terry v. Ohio, 392 U.S. 1, 21 (1968)). The search must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding," and, consistent with Payton, may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36. Likewise, if lawfully within the premises to make an arrest, the police may search the premises in order to locate the individual to be arrested. Id. at 330.

In this case, even if SA Coyle had possessed a valid arrest warrant, his conduct far exceeded the authority that would have been provided by such a document. Under Payton and Buie, requirements which would have been well-known to an experienced law enforcement official such as SA Coyle, with a decade of field experience, an arrest warrant would have conferred the

limited authority to: (1) enter the home, which according to SA Coyle involved a distance of only three feet; (2) locate and apprehend appellant in the foyer; and (3) remove appellant from the premises.  See Albrektsen, 151 F.3d at 955 ("[T]he mere existence of an arrest warrant does not authorize entry into a defendant's home, where there is no necessity to enter because the defendant can be arrested at the threshold"); Horton v. California, 496 U.S. 128, 140 (1990)("If the scope of the search exceeds that permitted by the terms of a validly issued warrant . . . the subsequent seizure is unconstitutional without more"). Once the law enforcement officials entered the dwelling and apprehended appellant in the foyer, appellant's seizure for unauthorized absence -- "the objective of the authorized intrusion" -- was complete.  See Wilson, 526 U.S. at 611. Nevertheless, the NCIS agents did not remove appellant from the premises, but instead, continued the intrusion into the home to further the aims of a separate matter -- the fraud investigation.  They moved appellant into the living room, searched the couch for weapons, placed him on the couch, retrieved a consent to search form from their automobile, procured appellant's signature on the consent form, obtained HM2 Guest's consent to search the home for appellant's belongings, seized the knapsack and a duffel bag, and then departed.

7

Although it was well within his authority to take actions necessary to protect his safety and the safety of his fellow law enforcement officers, SA Coyle's actions reflect that his concern over the contents of the knapsack prevailed over concerns about safety. He not only failed to conduct a protective sweep of the residence upon entry, but he also sent a lone agent upstairs with the owner of the residence to secure appellant's duffel bag. SA Coyle went well beyond the steps necessary to apprehend appellant and remove him from the residence -- out of the range of potential weapons and accomplices. Instead, SA Coyle moved appellant further into the residence. He moved appellant from the foyer, where the items were not within appellant's reach, into the living room, near the items he wanted to search. Such actions make it inappropriate to rely on officer safety as a basis for sustaining the consent under Brown, and underscores the purposefulness of the Fourth Amendment violations. Cf. United States v. Mason, 523 F.2d 1122, 1126 (D.C. Cir. 1975) (officers conducting an arrest may not "lead the accused from place to place and use his presence in each location to justify a 'search incident to arrest'").

### 3. The Consent Form

The lead opinion notes that the form used to record appellant's consent stated that he could refuse to grant permission to search. The lead opinion contends that because there is no legal requirement to provide such advice, provision of such advice suggests that the NCIS agents were not attempting to exploit the illegality and, therefore, did not act in a purposeful or flagrant manner. ___ MJ at (30).

It is noteworthy that the information at issue was contained in a preprinted form, and was not verbally communicated to appellant. Appellant was apprehended at 1:25 p.m., and he signed the consent form within 15 to 20 minutes of his apprehension while surrounded by four NCIS agents. Although the record reflects that appellant was advised orally of his rights against self-incrimination under Article 31, Uniform Code of Military Justice, 10 USC § 831, the record does not reflect any oral advice of his right to refuse consent to the search. Instead, the only evidence of advice regarding the search was the small print on the consent form that was provided to appellant in the immediate environment of his apprehension. Under these circumstances, use of a preprinted form does not satisfy the Government's burden to show that the officer's conduct was neither purposeful nor flagrant. Cf. United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994)(use of a consent

form following a lengthy conversation between the officer and accused indicated a lack of flagrant officer conduct when the officer also explained in English and Spanish that appellant had a right to refuse consent). Furthermore, advisement of rights alone does not act to sever the taint of the prior illegality. Brown, 422 U.S. at 603.


## 4. Conclusion

SA Coyle sought to secure appellant's knapsack in furtherance of a financial fraud investigation. He lacked probable cause to seize this item, so he sought to capitalize on an unrelated charge of unauthorized absence as a means of apprehending appellant while carrying the knapsack. His plan did not work as he had hoped, however, because he confronted appellant when he was not carrying the knapsack. The scope of the DD Form 553 relied upon by SA Coyle was limited to apprehension for unauthorized absence, and the actions of the NCIS agents in making that apprehension went far beyond the requirements for an apprehension or protection of officer safety.

The lead opinion suggests that SA Coyle acted with a subjective good faith belief that his actions were permissible. __ MJ at (30-33). We need not reach a judgment, however, as to his subjective beliefs. The attenuation analysis in Brown

cautions against reliance on the subjective good faith of a law enforcement officer, particularly with regard to assessing the purposefulness and flagrancy of the law enforcement officer's conduct.  Brown's attenuation analysis is designed to ameliorate the societal costs of employing the exclusionary rule by precluding its application at the point where it loses its deterrent effect.  As the Supreme Court noted in United States v. Leon, 468 U.S. 897 (1984), "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, house, papers, and effects' only in the discretion of the police."  Id. at 915 n.13 (quoting Beck v. Ohio, 379 U.S. 89, 97 (1964)).  We should evaluate an officer's conduct by considering whether a reasonably well-trained officer would have acted similarly under the circumstances.  Id. at 923; see also Malley v. Briggs, 475 U.S. 335, 345 (1986)("reasonably well-trained officer" is standard for assessing whether an officer is entitled to qualified immunity for applying for a warrant that is subsequently held invalid for lack of probable cause).  In the present case, a reasonably well-trained officer should have known that the scope of the law enforcement investigation undertaken after apprehension of appellant was not permissible under well-established law.

Under these circumstances, the Government has not met its burden to demonstrate the validity of the consent under the third prong of Brown.  I also agree with Judge Gierke's conclusion that the Government has not met its burden under applicable voluntariness standards.  The evidence obtained as a result of the search, including appellant's related confession, should have been suppressed.  Our Court should set aside the affected findings and the sentence, and authorize a rehearing.

<u>United States v. Khamsouk</u>, No. 01-0387/NA

SULLIVAN, Senior Judge (concurring in part and dissenting in part):

I would affirm this case, and I see no reason for a remand. I only agree with the lead opinion that evidence seized from appellant's knapsack and duffel bag and his confession at the Naval Criminal Investigative Service (NCIS) field office were admissible at his court-martial. I do not agree with the lead opinion's conclusion that appellant's arrest, without civilian search or arrest warrants, violated the Fourth Amendment. Moreover, I do not agree with its remand of this case under <u>United States v. Tardif</u>, __ MJ __ (2002). <u>See</u> <u>id</u>. (Sullivan, S.J., dissenting).

Appellant was arrested in Hospital Corpsman Second Class (HM2) Tom Guest's private off base residence in Chesapeake, Virginia, by Special Agent (SA) Edward M. Coyle, a civilian special agent of the NCIS. His arrest was directed by a command - issued Department of Defense Form 553 (Sep 89) Report of Deserter/Absentee Wanted By The Armed Forces, and Article 8, Uniform Code of Military Justice, 10 USC §838. In my view this arrest order is the equivalent of a civilian arrest warrant for purposes of Fourth Amendment analysis. <u>See generally</u>, <u>United States v. Stringer</u>, 37 MJ 120, 126 (CMA 1993); <u>see also</u> <u>United States v. Mitchell</u>, 12 MJ 265, 269 (CMA 1982); <u>cf</u>. <u>United States v. Thompson</u>, 33 MJ 218, 219 (CMA 1991)(noting that accused was arrested in residence in civilian community during undercover

operation involving Air Force Office of Special Investigations agents).  Whether appellant was a house guest rather than a resident of HM2 Guest's house, for purposes of the Fourth Amendment and R.C.M. 302(e), Manual for Courts-Martial, United States (1995 ed.), is an interesting question of law which I need not answer in this case.  See Watts v. County of Sacramento, 256 F.3d 886, 889 (9th Cir. 2001); cf. United States v. Gamez-Orduño, 235 F.3d 453, 458-460 (9th Cir. 2000); United States v. Salazar, 44 MJ 409, 414 (1996).

In this case, the owner of the house, HM2 Guest, tried to lure appellant out of his house so that the NCIS agents, armed with a properly authorized arrest document, could make a safe arrest.  When appellant showed himself to SA Coyle at the doorway of the house during this attempt, SA Coyle acted reasonably to pursue and seize appellant when he suddenly retreated into the living room of the house.  SA Coyle testified that he was concerned for "officer safety" since he could not tell whether anyone else or any weapon was in the living room where appellant fled.

In my view, this evidence shows that the law enforcement officers acted reasonably and responsibly in seizing appellant in the house of HM2 Guest.  See United States v. Santana, 427 U.S. 38 (1976).  Furthermore, HM2 Guest consented to the search of his home.  The Fourth Amendment requires only that searches and seizures be reasonable.  That is what the record in this case supports.  Accordingly, I see no unreasonable search and seizure

in violation of the Fourth Amendment in these circumstances.  Id.
See generally United States v. Stringer, 37 MJ at 126, 129 n.4;
United States v. Visser, 40 MJ 86, 91 (CMA 1994) (both applying
"reasonableness" standard to measure Fourth Amendment
constitutionality of government action in military context).