UNITED STATES, Appellee,

v.

Delmar R. MITCHELL, Private First
Class U. S. Army, Appellant.

No. 37,602.
CM 437700.

U. S. Court of Military Appeals.

Jan. 18, 1982.

For Appellant: *Captain Terrence L. Lewis* (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Charles A. Byler* (on briefs); *Major Benjamin A. Sims, Captain Robert L. Gallaway, Captain Willard E. Nyman, III.*

For Appellee: *Captain Michael E. Pfau* (argued); *Colonel R. R. Boller, Major Ted B. Borek, Major David McNeill, Jr., Major Michael B. Kennett, Captain Brian X. Bush, Captain Paul G. Thomson* (on brief); *Captain Thomas E. Booth.*

*Opinion*

EVERETT, Chief Judge:

On October 27, 1978, appellant was tried at Baumholder, Federal Republic of Germany, by a military judge, who acquitted him of a wrongful sale of heroin but convicted him of wrongful possession of heroin, in violation of Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934. The sentence was a bad-conduct discharge, confinement at hard labor for 6 months, partial forfeitures for 4 months, and reduction to the grade of E-1. The convening authority approved the findings and sentence; the United States Army Court of Military Review affirmed. This Court granted review on the issue (7 M.J. 380):

THE MILITARY JUDGE ERRED, TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT, BY IMPROPERLY ADMITTING INTO EVIDENCE, OVER APPELLANT'S OBJECTION, THE FRUITS OF AN ILLEGAL APPREHENSION.

I

At about 5:35 a.m. on May 2, 1978, Special Agent Clifford W. Ball of the Army Criminal Investigation Division (CID) met with an informant, Sergeant Sanders, who told him that the night before he visited appellant's off-post apartment and observed some heroin. At the time "Mitchell had indicated that he would have some heroin until . . . the next morning when he decided to go to work, or when he went [to] work." Ball drove Sanders to the area of the apartment, and then stopped and conducted a pat-down search of the informant to determine that he did not possess any contraband or money. Shortly after 6:00 a.m. Sanders, whom Ball had provided with marked money, proceeded to appellant's apartment, which was one of four apartments located in a two or three-story building. Less than five minutes later, Sergeant Sanders left the building, walked back to the CID agent, and advised that he had purchased a packet of heroin from appellant with some of the marked bills. Ball and Sanders next went to the CID office, where the informant delivered the packet that he had purchased. Special Agent Ball attempted to contact the German Criminal Police but was informed that they would not be at work until 7:30 a.m. Ball then left a message that a purchase of narcotics had been made, the United States government's money was inside appellant's apartment, and he "felt it was important to enter the apartment or apprehend Mitchell and secure the evidence as soon as possible." A few minutes later Ball received a call advising that the "duty man" for the German criminal police would arrive at the CID

office "within 5 or 10 minutes"; but, after waiting briefly for the Germans to appear and "not knowing what time Mitchell would leave for his duty," Ball left someone at his office to notify the German police where he would be and took Sergeant Sanders with him and returned to the building in which appellant's apartment was located.

From his knowledge of the military unit to which appellant was assigned, Special Agent Ball inferred that he would depart for work between 6:00 and 8:00 that morning; by this time it was almost 7:00 a.m. At this stage, Ball had decided to apprehend appellant immediately, take him to the CID office, and lock his apartment in order to secure it until the German Criminal Police could perform a search. In order to carry out his plan with the least risk that the evidence would be destroyed, Ball had Sanders ring for entry through the front door to the apartment building. When Sanders obtained entry, he left the door open for Ball to follow him. After Sanders entered appellant's apartment and while Ball was in the foyer or hallway of the building, the "walkie talkie" which the CID agent was carrying began to give out noise;

> Mitchell stuck his head back out the door. At which time . . . [Ball] told him I was CID and he was under apprehension. Mitchell then pulled his head back into the door to where I could not see him and I walked on up to the door and advised Mitchell to—that he was under apprehension and have a seat until KRIPO [the German Criminal Police] arrived. Which he did.

Ball did not immediately remove appellant from the premises because, as he "entered the door within the bedroom portion" of the apartment, he observed a woman asleep. Thinking that she might be German, in which event he had no jurisdiction over her, Ball did not awaken her; his intent was that when "the criminal police arrived they could take her from the apartment and I could take Mitchell from the apartment."

While they were waiting, appellant went to an open window and threw two items down onto the sidewalk outside the window. Thereupon, while trying to control appellant, Special Agent Ball sent Sergeant Sanders outside to pick up the items before some passerby could do so. When Sanders returned to the apartment, Ball then went outside to use his portable radio in order to try to locate the German Criminal Police. When he came back into the apartment, Sergeant Sanders called his attention to another suspicious item which was lying on the floor and which Ball then retrieved. Not long thereafter a German criminal policeman named Dickes arrived and advised that, while he was still outside the apartment, he saw appellant "throw items from the window," and then Sergeant Sanders came outside and picked them up. Ball requested that Dickes remove the woman from the apartment, and the CID agent prepared to remove Mitchell. Appellant "stepped back into the bedroom portion of his room and proceeded to get dressed"; at this time "he obtained a black pouch from a stand near the head of his bed." Ball "asked him what was in it," and appellant stated that it contained "Your money" and gave Ball the pouch. Upon checking the pouch, the CID agent found that, along with other currency, it contained two marked $20 bills which had been delivered to Sergeant Sanders for use in making the controlled purchase.

At trial appellant's counsel moved to suppress the two items which appellant had thrown out the apartment window, the box that Ball had retrieved from the floor, and the pouch containing the marked bills. The defense contended that all the evidence seized was the product of an apprehension that was unlawful because (a) it was made in appellant's off-post apartment without prior authorization from a military magistrate or commander, and (b) it violated the requirement of an applicable military directive that American military police and investigators not apprehend a suspect in a private off-post residence without the presence of German police officials.

In reply the Government argued that, when Special Agent Ball was standing in

the foyer or hallway of the apartment building, he was in a public place. Thus, when appellant stuck his head out the door of his apartment after hearing the noise from Ball's portable radio, he had exposed himself to view in a public place; afterwards when he retreated to the privacy of his apartment, the special agent was entitled to follow in hot pursuit. *See United States v. Santana,* 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

The military judge disagreed with the prosecution's contention that the apprehension "was attempted to be effected in a public place, and that because it begun [sic] in a public place he was justified under a doctrine of hot pursuit in entering the private dwelling." However, the judge also concluded that exigent circumstances existed which justified apprehending Mitchell inside his private dwelling. The judge observed: "[I]f the agent had taken the time to get the proper authorization from an appropriate commander, ... the lapse of time required to do so would have, in this case, jeopardized the possibility of recovering the recorded money." As to a defense argument that, absent prior authorization, Ball should have waited outside the apartment building and apprehended appellant when he exited to go to work, the judge remarked:

> [I]t is not required under those circumstances for the agent to, under those circumstances, to speculate on when or even if the accused would exit his dwelling so that the apprehension could be made outside in a public place. Even though the agent had some reason to believe that he might come out it was by no means certain that he would within any reasonable time. And that coupled with the uncertainty as to what might be happening to evidence inside the apartment in the meantime, I think, justifies the warrantless entry to make the apprehension.

## II

■ If the apprehension was illegal, all the evidence obtained as the direct result of such police misconduct must be excluded.

*Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Even the items which appellant threw out the window while he waited with Special Agent Ball for the German police would be subject to exclusion. *United States v. Swinson,* 48 C.M.R. 197 (A.F.C.M.R.1974). Article 7(b) of the Uniform Code, 10 U.S.C. § 807(b), states: "Any person authorized under regulations governing the armed forces to apprehend persons subject to this Chapter or to trial thereunder may do so upon reasonable belief that an offense has been committed and that the person apprehended committed it." The information provided by Sergeant Sanders, together with his performance of the controlled purchase, furnished Special Agent Ball with the probable cause required by Article 7 for a lawful apprehension.

■ The Manual for Courts-Martial provides:

> All commissioned officers, warrant officers, petty officers, and noncommissioned officers, and, when in the execution of their guard or police duties, Air Force Security police, military police, members of the shore patrol, and such persons that are designated by proper authority to perform guard or police duties, *including duties as criminal investigators,* are authorized to apprehend, if necessary, persons subject to the Code or subject to trial thereunder upon reasonable belief that an offense has been committed and that the person apprehended committed it.

Para. 19*a*, Manual for Courts-Martial, United States, 1969 (Revised edition) (emphasis supplied). The explicit reference to "criminal investigators"—which was not contained in the corresponding passage of Manual for Courts-Martial, United States, 1951 —makes clear that "police duties" include the performance of a criminal investigation.

■ Appellate defense counsel contend that Ball's apprehension was illegal because it contravened American obligations under the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces (NATO SOFA), 4 U.S.T.

1792, T.I.A.S. No. 2846 (effective date August 23, 1953). In *United States v. Whiting*, 12 M.J. 253 (C.M.A.1982), we rejected a similar argument with respect to an off-post search in Germany. The same rationale is applicable here—namely, that the Treaty was not intended to create any personal rights with respect to illegal apprehension.

Appellate defense counsel also contend that under the provisions of a USAREUR Supplement to Army Regulation 190–22, military law enforcement agents could not make an apprehension in a servicemember's off-post residence without the participation of the German police or, at the very least, their presence. *See United States v. Carlton*, 2 M.J. 510 (A.C.M.R.1976). In connection with a search of a servicemember's off-post quarters located in the Federal Republic of Germany, we rejected a similar argument in *United States v. Morris*, 12 M.J. 262 (C.M.A.1982); for the same reasons we reject appellant's contention that the directive upon which he relies was intended to create, or did create, any personal right that could be enforced by invoking the exclusionary rule.

Paragraph 3–20a, Army Regulation 195–2 (May 6, 1977), states in part:

> Absent exigent circumstances, individuals will not be apprehended in their on-post private dwelling without the prior appropriate authorization by a responsible commander based upon probable cause. An exigent circumstance would be one in which a delay would likely lead to the immediate escape of the individual to be apprehended or the loss of life. An individual may not evade apprehension by entering private quarters when being pursued; entry into the quarters under such circumstances is governed by the principle of hot pursuit. Warrantless entry into private quarters is permissible when there is probable cause to believe that there is evidence therein and that the evidence will be loss or destroyed unless it is immediately seized. This is an

exception to the requirement for search warrants. CID special agents may enter off-post private dwellings only if a search warrant is obtained or if they are invited to enter.

This directive's limitation of apprehension without prior authorization anticipated the Supreme Court's position in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), where the Supreme Court ruled that, absent exigent circumstances, an individual may not be arrested in his private residence without an arrest warrant. Noting that this regulation deals only with an "on-post private dwelling," appellate government counsel suggest that, with respect to off-post private dwellings in foreign countries, a special military necessity exists that a special agent be free to search without obtaining prior authorization from a commander or magistrate.

■ We cannot accept this interpretation of the regulation, since the servicemember in his off-post residence should be entitled to at least as much protection from arbitrary interference with his privacy as he receives when residing on post. Moreover, in view of probable concern to avoid offending officials of the host country, it seems likely that the draftsmen of the regulation would desire that, when feasible, "a responsible commander" give prior authorization for an apprehension off-post in a private residence overseas. Furthermore, whether or not the directive applies to an apprehension made by CID agents in an off-post private residence in a foreign country, we have no doubt that *Payton v. New York, supra*, provides protection under such circumstances. Although in foreign countries there may be a greater likelihood that "exigent circumstances" will exist to excuse obtaining prior authorization from a commander or magistrate, the off-post residence of a United States servicemember in a foreign country enjoys the same protection from United States law enforcement agents as an off-post residence in the United States.[1]

---

1. Of course, we are not deciding here whether, or to what extent, *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), applies to rooms in a military barracks or dormitory or to various other types of on-post military housing.

**270**

We also observe that the discussion of "exigent circumstances" in paragraph 3–20a of Army Regulation 195–2 refers only to "one in which a delay would likely lead to the immediate escape of the individual to be apprehended or the loss of life." Thus, there is no explicit recognition of the likelihood of destruction as "[a]n exigent circumstance," although judicial precedents embrace such a situation within the concept of "exigent circumstances." *United States v. Murray*, 12 M.J. 139 (C.M.A.1981); *United States v. Phinizy*, 12 M.J. 40 (C.M.A.1981). Since, in the second sentence following in the same paragraph of this regulation, "[w]arrantless entry into private quarters is . . . [authorized] where there is probable cause to believe that there is evidence therein and that the evidence will be lost or destroyed unless it is immediately seized," we conclude that the earlier sentence is illustrative and not exhaustive. Furthermore since we feel sure that the phrase "exigent circumstances" in *Payton v. New York, supra,* was intended to include a danger of destruction of evidence, we believe it especially appropriate to interpret paragraph 3–20a to include such a situation.

Since appellant's apartment was located in a small building which only contained three other apartments and entry was protected by an outside door which could only be opened from within, we are inclined to agree with the trial judge's determination that Special Agent Ball was no longer in a public place when he entered the foyer of the apartment building. Of more importance, we agree with the trial judge's conclusion that the warrantless entry into the building and into the apartment in order to make an apprehension was fully justified by "exigent circumstances." Ball had been informed that appellant would have the heroin at the apartment until he departed for work. The time for that departure was imminent and, despite diligent efforts by Ball to obtain their presence, the German criminal police had not arrived. Ball did not know who else besides appellant might be in his apartment or in the build-

ing. Thus, unless appellant was promptly apprehended inside his apartment, Ball faced the risk that Mitchell would deliver the drugs to someone else in the building. That person then might observe appellant's apprehension by Special Agent Ball outside the apartment building and might destroy the narcotics. Moreover, if Ball simply kept the building under surveillance while awaiting either the arrival of the German criminal police or appellant's exit from the building, there was the risk that appellant might notice that he was being watched or might see the German police arriving. In either event he would be alerted to destroy the contraband before it could be discovered.

Since the evidence is sufficient to support the military judge's determination that "exigent circumstances" existed which obviated the need to obtain a prior authorization for an apprehension inside a private dwelling, and since under such circumstances neither the Fourth Amendment nor the provisions of military regulations require that prior authorization be obtained from a magistrate or "responsible commander," the apprehension was lawful and its fruits were admissible.

### III

The decision of the United States Army Court of Military Review is affirmed.

COOK, Judge (concurring in the result):

I have reservations about a number of statements in the principal opinion. For example, I am not at all sure of the correctness of the speculation that if accused's "apprehension was illegal, . . . the items . . . [he] threw out the window . . . would be subject to exclusion" (12 M.J. 265, 268) as evidence derived from an illegal act. Where the Government procures items of evidence through exploitation by the police of an illegal arrest, the latter would taint the former and make it subject to the exclusionary rule. *United States v. Robinson*, 6 M.J. 109 (C.M.A.1979). It seems to me,

however, that when an arrested person surreptitiously throws an article into a public street, that action is his own, not an endeavor by the police to use an illegal arrest to seize the items. Such a situation appears analogous to that in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). There, the defendant confessed after an illegal arrest, but the confession was determined to be admissible. The Supreme·Court held that it was not tainted by the illegal arrest "simply because it would not have come to light *but for* the illegal actions of the police." *Id.* at 488, 83 S.Ct. at 417 (emphasis supplied). Also, the principal opinion turns aside accused's challenge to the legality of his apprehension because he lacks standing to rely upon any provision of the Agreement to supplement the Agreement Between the Parties to the North Atlantic Treaty regarding the Status of Their Forces with respect to Foreign Forces stationed in the Federal Republic of Germany (Supplementary Agreement), 14 U.S.T. 531, T.I.A.S. No. 5351 (effective date—July 1, 1963), that deals with search and seizure. In my opinion in *United States v. Bunkley*, 12 M.J. 240 (C.M.A. 1982), I discussed an asserted construction of a particular provision which, if credited, would support an individual right to invoke an exclusionary rule in respect to evidence obtained in violation thereof. I am not prepared to accept the majority's summary pronouncement to the contrary. Further, it has been judicially remarked that the reasonable expectation of privacy of an occupant of a multiple dwelling begins "at the door to [his] room ... rather than at the door to the entire" building. *United States v. Anderson*, 533 F.2d 1210, 1214 (D.C. Cir. 1976). I am not, therefore, "inclined," as are my Brothers, "to agree with the trial judge's determination that Special Agent Ball was no longer in a public place when he entered the foyer of the apartment building." 12 M.J. at 270.

I am satisfied that sufficient evidence supports the trial judge's determination of the existence of exigent circumstances to justify Agent Ball's actions, and, therefore, I join in sustaining the admissibility of the evidence and in affirming the decision of the Court of Military Review.

FLETCHER, Judge (concurring in the result):

I cannot join in affirming this case on the basis of the majority opinions in *United States v. Whiting*, 12 M.J. 253 (C.M.A. 1982), and in *United States v. Morris*, 12 M.J. 262 (C.M.A.1982). Nevertheless, I conclude that exigent circumstances existed in this case which rendered the search both reasonable and lawful. *See United States v. Whiting, supra* (Fletcher, J., dissenting).