CRAWFORD, Chief Judge
(concurring in part and dissenting in part):
For the following reasons, I concur in the result as to the motion to suppress:
(1) The police needed only a Department of Defense (DD) Form 553 on which the commanding officer certified under oath *295 probable cause to believe that appellant was a deserter because they already had reasonable cause to believe that appellant was “liv[ing]” at Guest’s apartment. Payton v. New York, 445 U.S. 573, 602-03, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); see also Steagald v. United States, 451 U.S. 204, 214, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).
(2) Assuming the DD Form 553 does not satisfy the requirement for an arrest warrant, and that a search warrant was required, exigent circumstances would excuse the lack of either warrant.
(3) The rights warning severed any illegality.
FACTS
On December 18,1996, Special Agent (SA) Edward M. Coyle, of the Naval Criminal Investigative Service (NCIS), Norfolk, Virginia, field office, initiated a credit card theft and fraud investigation against appellant, who was then known as “SHSA Anthony Khamsouk.” SA Coyle soon learned that appellant was absent without leave from the Navy. On January 6, 1997, the commanding officer executed a DD Form 553, which declared appellant a “Deserter/Absentee Wanted by the Armed Forces.” The DD Form 553 indicated that appellant had, in violation of Article 85, UCMJ, 10 USC § 885, “without authority and with intent to remain away therefrom permanently,” absented himself on December 13, 1996. The DD Form 553 was executed by the commanding officer based on personal knowledge and under the penalty of perjury that appellant was a deserter.
During January 1997, the fraud investigation into appellant’s criminal schemes expanded into other financial dealings.[1] At some point prior to February 5, 1997, SA Coyle learned that appellant had attempted to use an automated teller machine card in St. Louis, Missouri, and therefore, he contacted appellant’s command to obtain a copy of the DD Form 553. In early February 1997, SA Coyle interviewed two citizens who indicated that appellant was involved in a credit card ¡fraud scheme. One of these citizens told SA Coyle that appellant was staying at the home of Hospital Corpsman Second Class (HM2) Tom Guest on Jackson Avenue. The citizen also told SA Coyle that appellant always traveled with a knapsack, and that this knapsack might contain evidence of credit card fraud. In addition, the citizen stated that appellant was likely moving to Los Angeles in the near future. As set forth below, these facts were later corroborated by HM2 Guest.
Based on this information, SA Coyle, accompanied by three other NCIS agents, established surveillance of HM2 Guest’s home on February 5, 1997. HM2 Guest owned the home on Jackson Avenue, which was a private, off-base residence. SA Coyle and his colleagues did not plan to enter HM2 Guest’s home to apprehend appellant; rather, they were waiting for appellant to leave the home because they had received information that he had an appointment at about 2:00 p.m. The investigators suspected appellant was involved in a fraudulent scheme using numerous credit cards with someone else’s identity. Presenting one of these cards, appellant would call a restaurant and reserve a dinner for a group of about ten people. However, just before the appointment, he would call the restaurant and tell them that he could not attend but would treat his friends. He would then ask the restaurant to charge the dinner to his credit card and add a healthy tip, sometimes in excess of 25 percent. Because the fraudulent use of the credit cards happened numerous times in the Norfolk area, the agents knew others were involved. Even so, SA Coyle at this point testified that he believed he could not enter HM2 Guest’s *296 residence to apprehend appellant without a search warrant.
At approximately 1:20 p.m., SA Coyle observed two men leave HM2 Guest’s house. He could not determine whether either man was appellant, so he stopped them both and asked for their identification. Neither man was appellant. One of the men, HM2 Guest, identified himself as the owner of the house. HM2 Guest testified that the NCIS agents arrived in “two or three cars” and told them to “freeze.” He testified further that the NCIS agents apparently believed the other man was appellant, and therefore, they placed him up against HM2 Guest’s car. SA Coyle identified himself and asked HM2 Guest if he knew appellant’s whereabouts. SA Coyle explained that he had an arrest warrant for appellant, and HM2 Guest told him that appellant was inside his home. SA Coyle asked HM2 Guest for permission to enter the house to arrest appellant, but HM2 Guest demurred, saying that he “would prefer” to bring appellant out himself.
At that point, SA Coyle followed HM2 Guest to the front door and waited on the front porch, just outside the doorway. The door remained open, and HM2 Guest stepped into the foyer. While standing in the passageway between the foyer and the living room, HM2 Guest called out to appellant in the living room, telling him to “come to the door” because someone wanted to speak with him. In response to HM2 Guest’s summons, appellant came toward the door. SA Coyle saw appellant as he peeked around from the living room, approximately three feet away from the front door. At this point, he was concerned about his safety and the safety of the other officers based on appellant’s criminal conduct and use of multiple accomplices in the local area. When appellant peered around the counter, SA Coyle had no knowledge who was present or what weapons were in the residence and might be used. SA Coyle asked appellant if he was “Anthony Khamsouk,” and then told him he was under arrest. During this exchange, or immediately afterwards, SA Coyle stepped into the foyer and took appellant into custody. SA Coyle had the DD Form 553 in his possession when he apprehended appellant. The apprehension alleviated the agent’s concern for his safety and the safety of the other officers, as well as for the destruction of items he saw in the room.
SA Coyle then moved appellant into the living room and sat him down on the sofa. After advising him of his rights under Article 31, Uniform Code of Military Justice (UCMJ), 10 USC § 831, SA Coyle asked appellant if a knapsack sitting near the sofa was his, and appellant said it was. Appellant was asked if the knapsack was the only belonging he had in the house, and he replied affirmatively. HM2 Guest then stated that appellant was not being truthful, and that he had another bag upstairs. HM2 Guest volunteered to go get the bag for the NCIS agents. He also executed a “Permissive Authorization for Search and Seizure” form, which states that the signatory has been informed of his “constitutional right to refuse to permit the search in the absence of a search warrant____” HM2 Guest led another NCIS agent to the duffel bag, which was located on the second floor.
In the meantime, SA Coyle asked appellant to execute a consent form identical to the one HM2 Guest signed. Appellant executed the form while he sat in the living room. Although the bags were subsequently subjected to a cursory examination for weapons at the scene, neither the knapsack nor the duffel bag were searched at HM2 Guest’s home.
Appellant was taken to the NCIS field office and re-advised of his Article 31 rights using the standard NCIS rights advisement and waiver form. Appellant indicated that he understood his rights, initialing each one, and thereafter signed and dated the waiver. Appellant was not similarly re-advised of his search and seizure rights.
Appellant falsely identified himself as “Anthony Khamsouk” and provided a military identification card bearing his picture and that name. A search of appellant yielded an American Express card in the name of Eric Johnson, and a Mastercard from his shirt pocket in the name of Virginia Green. A date book was taken from appellant which *297 contained several credit card receipts. SA Coyle then interviewed appellant about items taken from the knapsack and duffel bag. Appellant admitted that he had obtained a list of credit card numbers from a purported member of an Asian gang in Portland, Oregon, and that he had used these credit card numbers to make credit purchases at restaurants and clothing stores, and to purchase airline tickets. It took NCIS agents more than a day to inventory nearly one hundred items of evidentiary value taken from the knapsack and duffel bag.
HM2 Guest testified at the hearing pursuant to Article 39(a), UCMJ, 10 USC § 839(a), that appellant was staying with him for a few days. He stated that he was not aware of appellant having any other residence, and that appellant was using his house as his “home base.” When asked if he had been willing to assist SA Coyle in apprehending appellant, HM2 Guest explained that if appellant had done something “wrong[,] and they had a warrant for his arrest,” then he was willing to bring him out of the house so that appellant could deal with them personally. HM2 Guest also described appellant as appearing “scared” when he peeked around the living room doorway in response to HM2 Guest’s summons.
SA Coyle testified that he “frequently apprehended deserters based on information provided by computer read out that there was a warrant issued for the arrest of a subject through NCIC,” but, in this particular case, he had only a copy of the DD Form 553 with him at the time of apprehension. SA Coyle also stated that he was concerned about safety because he did not know whether there were any weapons in the house, or whether appellant was carrying a weapon; therefore, when he saw appellant peek around the corner of the living room, he decided to immediately take custody of him.
DISCUSSION
This Court accepts the findings of the military judge unless clearly erroneous. See, e.g., United States v. Hollis, 57 MJ 74 (2002); however, the issues in this case—the right to privacy, the warrant requirement, the exigent circumstances exception, and the fruit of the poisonous tree doctrine—are all reviewed under a de novo standard of review. Cf. Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).
Appellant’s rights in this case, like a defendant in a federal or state court ease, stem from the Constitution, statutes, rales of procedure (in the military, called Rules for Courts-Martial), and the common law. See, e.g., United States v. Lopez, 35 MJ 35 (CMA 1992). While the Supreme Court has assumed the Bill of Rights applies to the military, see, e.g., Davis v. United States, 512 U.S. 452, 457 n. *, 114 S.Ct. 2350 (1994), this Court has held that they apply absent military necessity or operational needs. United States v. Jacoby, 11 USCMA 428, 430-31, 29 CMR 244, 246-47 (1960).
The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
It contains two clauses: the Warrant Clause and the Reasonableness Clause. Over the years, the Supreme Court has recognized the “cardinal principle that ‘searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.’” Mincey v. Arizona, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)(quoted in California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991)); see also Horton v. California, 496 U.S. 128, 133 n. 4, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). One of these exceptions is a search incident to a lawful arrest. To prevent any abuse of this exception, the Supreme Court reinforced the Warrant Clause in Payton.

*298
Payton/Steagald

In Payton, the Court held that absent exigent circumstances, “the Fourth Amendment ... prohibits the police from making a warrantless and nonconsensual entry into a suspect’s home in order to make a routine felony arrest.” 445 U.S. at 576, 100 S.Ct. 1371. The Court recognized “an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.” Id. at 603, 100 S.Ct. 1371. This was a recognition of the special privacy interest in one’s home. While the Court permits the use of an arrest warrant for nonconsensual entry when an individual lives at the house, Steagald requires a search warrant, rather than merely an arrest warrant, for a nonconsensual entry into a third party’s residence when the individual sought by law enforcement authorities is living there. 451 U.S. at 213-14, 101 S.Ct. 1642.
In 1984, R.C.M. 302(e)(2) was added to the Manual for Courts-Martial to adopt “the warrant requirement of Payton ... conforming the procedure to military practice.” Drafters’ Analysis of R.C.M. 302(e), Manual for Courts-Martial, United States, 1984, at A21-13. This provision remains unchanged today. R.C.M. 302(e)(2), Manual for Courts-Martial, United States (2000 ed.). R.C.M. 302 does not define “resident,” the language used in both Payton and Steagald, in terms of where a suspect lives.
What constitutes “living at the house?” Does it equate to the requirements for standing? Must the individual be the lessee or the owner, or something in between? Lines must be drawn. It may be that the line should be drawn between a guest in a household and someone who is staying for an agreed-upon duration and could consent to a search of the premises, but that has hot been decided to date. The dissenters in Steagald suggested a fairly short time-line: “If a suspect has been living in a particular dwelling for any significant period, say a few days, it can certainly be considered his ‘home’ for Fourth Amendment purposes____” 451 U.S. at 230-31, 101 S.Ct. 1642 (Rehnquist, J., dissenting).
In this case, appellant was more than an overnight guest. Even if he was an overnight guest, the police had probable cause to believe that he was living at the house. Appellant had been living in KM2 Guest’s house for a number of days and planned to leave three or four days after the search. Thus, Payton, rather than Steagald, would apply. Because appellant was living at the house, a warrant to search was not needed for the entry in this case. See, e.g., Watts v. County of Sacramento, 256 F.3d 886, 889-90 (9th Cir.2001); see also Werbicki v. County of Los Angeles, 32 Fed.Appx. 302 (9th Cir.2002). The DD Form 553 was sufficient.

Exigent Circumstances

An exigent circumstance is an exception to both Payton and Steagald. See Kirk v. Louisiana, 536 U.S. 635, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002)(state court reversed because the officer had neither an arrest warrant nor a search warrant, and the state court “declined to decide whether exigent circumstances had been present”); cf Maryland v. Buie, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). A warrantless entry[2] will be sustained when the circumstances were such as to lead a person of reasonable caution to conclude that evidence of a crime would be found on the premises, and that such evidence would probably be destroyed within the time necessary to obtain a search warrant. See Roaden v. Kentucky, 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973); United States v. Mitchell, 12 MJ 265 (CMA 1982); United States v. Elkins, 732 F.2d 1280 (6th Cir.1984). Moreover, Mil.R.Evid. 315, Manual, supra, entitled “Probable cause searches,” provides specific guidance with respect to exigent circumstances. Mil.R.Evid. 315(g) states, in pertinent part:
*299 A search warrant or search authorization is not required under this rule for a search based on probable cause when:
(1) Insufficient time. There is a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought____
In addition, Mil.R.Evid. 316(d)(4)(B), Manual, supra, explicitly allows the seizure of evidence in the case of exigent circumstances, as defined in Mil.R.Evid. 315(g). Mil.R.Evid. 316(f), the “catch-all” provision, provides that “[a] seizure of a type not otherwise included in this rule may be made when permissible under the Constitution of the United States as applied to members of the armed forces.”
Exigent circumstances may arise when law enforcement officers “tip their hand” and reveal the existence of an investigation, or those officers reasonably believe that the “possessors of the contraband” are aware that the police are “on their trail.” See, e.g., United States v. Rubin, 474 F.2d 262, 268 (3d Cir.1973), cert. denied, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973); United States v. Parra, 2 F.3d 1058 (10th Cir.1993)(exigent circumstances arose when agents believed that other suspects may have observed them from a partially open door arresting a confederate and, as a result, might begin destroying evidence); United States v. Almonte, 952 F.2d 20 (1st Cir.1991)(commotion resulting from convergence of agents following undercover drug purchase justified warrantless initial sweep of defendant’s apartment where apartment was located across the street from drug transaction); United States v. Socey, 846 F.2d 1439 (D.C.Cir.1988)(exigent circumstances justified entry when agents had a reasonable belief that third persons inside a private dwelling were aware of an investigatory stop or arrest of a confederate outside the premises and might see a need to destroy evidence); United States v. Wulferdinger, 782 F.2d 1473 (9th Cir.1986)(exigent circumstances justified warrantless entry where confederate’s failure to return to premises, due to arrest, might cause those inside to dispose of evidence); United States v. Gardner, 553 F.2d 946 (5th Cir.1977) (narcotics-related arrest outside home, involving agents in five cars with guns drawn, coupled with knowledge that drugs were inside the home and a female suspect remained inside, provided agents with reasonable belief that an immediate entry was necessary to prevent disposal of drugs inside home).
For example, in United States v. Elkins, the Sixth Circuit held that a warrantless entry was justified once a surveillance team had revealed their presence and a reasonably cautious person would have concluded that Elkins had seen the officers and, therefore, would “prudently proceed to dispatch all possible evidence.” 732 F.2d 1280, 1285 (6th Cir.1984). In that case, officers had probable cause to believe that Elkins was involved in narcotics trafficking, had recently participated in a controlled delivery of cocaine, and that he was currently in his residence. Id. at 1284. Agents established surveillance around Elkins’s home and began the process of obtaining a search warrant. Id. at 1283-84. Two cars then drove down Elkins’s driveway, including a vehicle associated with Elkins, and the “entire surveillance team of four or five cars” converged on the driveway to halt the departing vehicles. Id. at 1283. After determining that Elkins was not in either car, the agent in charge determined that the occupants of the house had probably seen the commotion and were in the process of destroying evidence. Id. Agents then entered the house, made a protective sweep, and took several individuals into custody. Id. at 1283-84. The Court found that after causing the commotion in the driveway and discovering that neither person arrested was Elkins, “a reasonably cautious person would quickly conclude that Elkins, who was still in the house, had seen the hubbub, realized the situation, and would prudently proceed to dispatch all possible evidence.” Id. at 1285. Moreover, the court concluded, that evidence would reasonably be expected to include additional cocaine, books and records of the enterprise, and drug paraphernalia. Id. The court further explained that once the agents entered the premises, they were required to sweep for weapons and the safety *300 of all concerned, and that this was done with minimal intrusion. Id.
In United States v. Mitchell, this Court arrived at the same conclusion in a case with similar facts. 12 MJ 265 (CMA 1982). In that case, an informant provided the Army-Criminal Investigation Command (CID) with information indicating that Mitchell had heroin in his off-post apartment in Germany and he would have it until he left for work the next morning. Id. at 266. A CID agent sent the informant, with marked money, to make a controlled purchase of heroin from Mitchell. Id. The informant completed the transaction inside the apartment and reported back to the agent. Id. The agent then repeatedly attempted to coordinate with the German police and have them conduct a search of the premises. Id. at 267. The German police did not respond promptly, so the agent went to Mitchell’s apartment to secure it until the German Police could perform a search. Id. The agent feared that Mitchell would be leaving for work because it was almost 7:00 a.m. The agent asked the informant to ring Mitchell’s doorbell in order to gain entry through the front door of the apartment building. Id. When the informant subsequently entered Mitchell’s apartment, having been invited by Mitchell, the informant left the front door open. Id. While the agent waited in the hallway outside Mitchell’s front door, his walkie-talkie began to sound. Id. At that point, “Mitchell stuck his head back out the door” and the agent told him he was under apprehension. Id. Mitchell pulled back into the apartment and the agent told him to have a seat until the German police arrived. Id. Mitchell subsequently tried to throw evidence out the window. Id.
While the military judge declined to uphold the arrest of Mitchell in the apartment based on a theory of hot pursuit, the judge concluded that “exigent circumstances existed which justified apprehending Mitchell inside his private dwelling.” Id. at 268. The judge observed that “if the agent had taken the time to get the proper authorization from an appropriate commander, ... the lapse of time required to do so would have, in this case, jeopardized the possibility of recovering the recorded money.” Id. The military judge explained further that
it is not required under those circumstances for the agent to ... speculate on when or even if the accused would exit his dwelling so that the apprehension could be made outside in a public place. Even though the agent had some reason to believe that he might come out[,] it was by no means certain that he would within any reasonable time. And that[,] coupled with the uncertainty as to what might be happening to evidence in the apartment in the meantime, I think, justifies the warrantless entry to make the apprehension.

Id.

This Court explicitly held in Mitchell that the phrase “exigent circumstances,” as used in Payton, was intended to encompass the danger of destruction of evidence. Id. at 270. Thus, the Court affirmed the trial judge’s conclusion that the warrantless entry into the apartment was fully justified by “exigent circumstances.” This Court surmised that if Mitchell had not been promptly apprehended, and the agent had continued his surveillance, “there was the risk that [the] appellant might notice that he was being watched or might see the German police arriving” and be alerted to destroy the contraband before it could be discovered. Id.
Likewise, in this case, exigent circumstances arose once SA Coyle and his colleagues, “in two or three ears,” approached HM2 Guest and his friend outside the Jackson Avenue house. Once the NCIS agents had “tipped their hand,” SA Coyle could have reasonably believed that appellant would have noticed what was happening out front and would destroy evidence of his credit card schemes. SA Coyle knew before he went to Jackson Avenue that appellant was suspected of being involved in an extensive fraud scheme, and that he always carried a knapsack that might contain evidence of the fraud. It is reasonable to assume that SA Coyle would have deduced that the evidence contained in the knapsack might include items that are easily destroyed, such as documents, credit card receipts, or credit card number information. SA Coyle knew that *301 appellant was a deserter, and that appellant likely understood that the Navy would be looking for him.[3] Moreover, once appellant tentatively peeked his head around the corner of the living room, with a scared look on his face, SA Coyle had even more reason to believe that, if allowed to, appellant would attempt to destroy evidence of his crimes.
This also is not a case where law enforcement officers “manufactured” exigent circumstances to obtain entry into HM2 Guest’s home. See United States v. Tarazon, 989 F.2d 1045, 1050 (9th Cir.1993)(officers did not create exigent circumstances as means of obviating need for obtaining warrant when they believed they had probable cause to enter only after they went to establishment and circumstances arose indicating that suspects inside might suspect presence of law enforcement and destroy evidence). To the contrary, SA Coyle did not know whether appellant was at the Jackson Avenue house until HM2 Guest told him so. At that point, the “cat was out of the bag, and exigent circumstances arose justifying the entry into the house.”
It is worth noting that the intrusion here was minimal and tailored to the circumstances as they developed. The NCIS agents did not conduct a search of HM2 Guest’s house; rather they merely seized appellant’s knapsack, which was found near appellant, and his duffel bag, which HM2 Guest located for the NCIS agents. To'the extent that HM2 Guest’s privacy interests were invaded that day, the intrusion was remarkably circumscribed and reasonable in the face of rapid developments. Indeed, if NCIS agents had pursued an alternate course of action and secured the Jackson Avenue house while they sought a search warrant, HM2 Guest’s privacy interests as a resident and homeowner would have been invaded in a much more onerous fashion. At a minimum, he would have been prevented from enjoying the interior of his house for a much longer period of time. It is also reasonable to assume that, had the NCIS agents obtained a search warrant, the search for evidence would have taken much longer and would have involved a larger area of the house. See Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)(Court unwilling to characterize an immediate search as a greater intrusion than a seizure and an indefinite immobilization while securing warrant); United States v. Johnson, 862 F.2d 1135, 1139 (5th Cir.1988)(detaining suspects while obtaining search warrant more intrusive than immediate search).
Because the NCIS agents acted reasonably in the face of exigent circumstances, the evidence seized as a result of that apprehension was properly admitted by the military judge.

Exclusionary Rule

The exclusionary rule has been applied by federal, state, and military courts to violations of the Fourth Amendment right to privacy, violations of the Fifth Amendment, U.S. Const, amend. V, due process and self-incrimination clauses, and Sixth Amendment, U.S. Const, amend. VI, right to counsel. In describing the application of the exclusionary rule, the courts have, over the years, declined to apply the exclusionary rule where there is attenuation, an independent source, or inevitable discovery. Regardless of the violation, courts have applied the Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), factors. Thus, I agree with the majority in applying the Brown factors to this case.
On Issue III, I dissent for the reasons set forth in my separate opinion in United States v. Tardif, 57 MJ 219 (2002).

. Subsequent investigation, in the spring and summer of 1997, revealed that appellant’s fraudulent schemes had cut a wide swathe across the United States, Japan, and Germany. NCIS agents learned in March, 1997, that appellant’s true identity was Toro Khamsouk, and that he was suspected of having been a member of an Asian gang in the Portland, Oregon, area. Investigative leads concerning appellant’s fraudulent use of stolen credit cards were followed throughout the country, to include California, Maine, Oregon, and Missouri. Secret Service agents tracked down and interviewed the real Anthony Khamsouk. In all, more than 20 law enforcement agents were involved in the investigation and the collection of far-flung evidence.

. I will use the term "warrantless entry,” for purposes of this section of my opinion, because SA Coyle did not have a search warrant for HM2 Guest’s home. As set forth above, under the facts of this case, I do not believe that he needed both an arrest and a search warrant to make a reasonable entry into HM2 Guest’s home.

. In United States v. Ayala, 26 MJ 190, 193 (CMA 1988), this Court held, inter alia, that the appellant’s "actions in putting in for retirement and clearing his quarters were strong indications of an intention on his part to flee.” This was one of two factors considered in determining that exigent circumstances existed to justify appellant’s immediate apprehension without authorization of his commander. Likewise, because appellant was a deserter, and had deliberately absconded from the Navy, SA Coyle could reasonably have believed that appellant might flee the area before he could obtain a search warrant.